PER CURIAM:
Warren Lee Hill, Jr. appeals from the district court’s denial of his 28 U.S.C. § 2254 habeas petition in which he challenged his death sentence. The district court granted a certificate of appealability on Hill’s claim that the Georgia Supreme Court’s decision upholding Georgia’s statutory requirement that in order to be exempt from execution Hill must prove his mental retardation beyond any reasonable doubt is contrary to clearly established federal law as announced in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). We conclude that because Georgia’s requirement of proof be *1274 yond a reasonable doubt necessarily will result in the execution of the mentally retarded, the Georgia Supreme Court’s decision is contrary to the clearly established rule of Atkins. The execution of the mentally retarded is prohibited by the Eighth Amendment’s ban against cruel and unusual punishment. We therefore reverse and remand.
I. Background
Hill was convicted and sentenced to death in 1991 for the murder of a fellow Georgia state prison inmate. His conviction and sentence were affirmed on direct appeal by the Georgia Supreme Court in 1993, Hill v. State, 263 Ga. 37, 427 S.E.2d 770 (1993), and the United States Supreme Court denied certiorari, Hill v. Georgia, 510 U.S. 950, 114 S.Ct. 396, 126 L.Ed.2d 344, rehrg. denied, Hill v. Georgia, 510 U.S. 1066, 114 S.Ct. 745, 126 L.Ed.2d 708 (1994).
Hill commenced state court habeas proceedings in 1994, during the course of which he raised a claim that he was exempt from execution under Georgia law based on mental retardation.[1] Hill presented the state habeas court with several lay and expert witness affidavits, which the court found provided credible evidence of Hill’s mental retardation. Accordingly, the state habeas court granted his writ for the limited purpose of conducting a jury trial on the issue of his mental retardation. Upon appeal by the State, the Georgia Supreme Court reversed and remanded the case, directing the state habeas court, without the intervention of a jury, to determine whether Hill had established his claim of mental retardation beyond a reasonable doubt. Turpin v. Hill, 269 Ga. 302, 498 S.E.2d 52 (1998). Under Georgia law, a defendant who demonstrates that he has “significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period” is deemed mentally retarded. Ga.Code Ann. § 17-7-131(a)(3). The defendant bears the burden of proving his mental retardation and “may be found ‘guilty but mentally retarded’ if the jury, or court acting as trier of facts, finds beyond a reasonable doubt that the defendant is guilty of the crime charged and is mentally retarded.” Id. § 17-7-131(c).
Upon remand, the state habeas court held an evidentiary hearing regarding the merits of Hill’s claim that he is mentally retarded. The court issued its order on that claim, finding that under Georgia’s substantive definition of mental retardation Hill had proved beyond a reasonable doubt that his IQ met the criterion for a diagnosis of mental retardation.[2] The court made an additional finding that Hill did not meet the exacting reasonable doubt standard regarding deficits in adaptive functioning.[3] The state habeas court therefore concluded that Hill could not prove his mental retardation under Georgia’s stringent statutory standard, and thus, was not entitled to habeas relief on this ground.
*1275 While Hill’s state habeas case was still pending, the United States Supreme Court decided Atkins, in which it held that the execution of mentally retarded offenders is categorically prohibited by the Eighth Amendment to the U.S. Constitution. 536 U.S. at 321, 122 S.Ct. 2242. In light of this decision, Hill sought reconsideration on his mental retardation claim, specifically asserting that Georgia’s standard requiring proof beyond a reasonable doubt for such claims was unconstitutional. The state habeas court agreed that the beyond a reasonable doubt standard placed an undue burden on Hill by creating “an extremely high likelihood of erroneously executing mentally retarded defendants by placing almost the entire risk of error upon the defendant.” The court also commented that this high burden of proof is “unsuited” to the issue of mental retardation, especially because someone, like Hill, who is mentally retarded but in the lower range of that classification,[4] will be particularly susceptible to the risk of an erroneous determination that he is not mentally retarded. Thus, the court granted Hill’s motion, finding that Hill was mentally retarded by a preponderance of the evidence and that Georgia’s reasonable doubt standard was unconstitutional in light of Supreme Court precedent. The State appealed and the Georgia Supreme Court reversed, holding that, even under Atkins, Georgia’s beyond a reasonable doubt standard of proof for a claim of mental retardation remains constitutionally permissible. Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 620-22 (2003) (4-3 decision) (Sears, P.J., dissenting).
Hill then commenced the instant federal habeas proceeding, raising again the question of whether Georgia’s requirement that mental retardation be proved beyond any reasonable doubt violates the dictates of Atkins. The district court denied the petition but granted Hill’s request for a certificate of appealability on the mental retardation claim, which is now before us.
II. Standard of Review
Our review of Hill’s federal habeas petition is governed by the standards set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”). For any claim adjudicated on the merits in state court, § 2254(d) allows federal habeas relief only where the state court adjudication
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d). Here, the Georgia Supreme Court’s determination — that it is constitutionally permissible for Georgia to require an offender to prove mental retardation beyond a reasonable doubt — involves a question of law, thus we must decide whether this decision is “contrary to” or an “unreasonable application” of federal law as determined by the Supreme Court.
A decision “contrary to” federal law contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts — in short, it is a decision “substantially different from the [Supreme Court’s] relevant *1276 precedent .... ’’ Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
A decision that unreasonably applies federal law identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner’s case, “unreasonably extends [the] principle ... to a new context where it should not apply, or unreasonably refuses to extend [it] to a new context where it should apply.” Williams v. Taylor, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Moreover, AEDPA does not “require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.” Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (quoting Carey v. Musladin, 549 U.S. 70, 81, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (Kennedy, J., concurring in judgment)).
III. Discussion
In Atkins, the Supreme Court was presented with the question of whether the execution of mentally retarded offenders constitutes cruel and unusual punishment prohibited by the Eighth Amendment to the U.S. Constitution. 536 U.S. at 307, 122 S.Ct. 2242. The Court unequivocally answered this question in the affirmative, explaining that the execution of the mentally retarded did not advance either of the penological purposes of the death penalty, i.e., retribution or deterrence, given the diminished cognitive and behavioral capacities of the mentally retarded that render them less culpable than the average offender. Id. at 318-20, 122 S.Ct. 2242. Accordingly, it concluded that the execution of mentally retarded offenders “is excessive and that the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender.” Id. at 321, 122 S.Ct. 2242 (quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). If an offender is mentally retarded, he may not be executed.[5]
Atkins did not define mental retardation, leaving it to the states to develop appropriate ways to prohibit the execution of the mentally retarded. The Court did provide some guidance to the states regarding the definition of mental retardation by citing two clinical definitions of mental retardation that it noted were consistent with many state statutory definitions. Atkins, 536 U.S. at 308 n. 3, 317 n. 22, 122 S.Ct. 2242. As noted, Georgia *1277 defines mental retardation consistent with those definitions as “significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period.” Ga.Code Ann. § 17-7-131(a)(3). Notably, however, Georgia is the only state to require proof of that status beyond a reasonable doubt.[6] Id. § 17-7-131(3).
In Hill’s state habeas appeal, the Georgia Supreme Court correctly acknowledged that “Atkins announced a new federal constitutional prohibition against executing an entire class of persons,” and that it “must determine whether, under the authority of federal constitutional law, the beyond a reasonable doubt standard continues to be an acceptable standard of proof to apply to mental retardation claims.” Hill, 587 5. F.2d at 621. It pointed out that Atkins left to the states the task of developing ways to enforce the constitutional restriction on the execution of the mentally retarded. Id. It further noted that “nothing in Atkins instructs the states to apply any particular standard of proof to mental retardation claims.” Id. The court then concluded that because Atkins recognized there may be dispute about who is and who is not mentally retarded, the Georgia legislature was “within constitutional bounds in establishing a procedure for considering alleged mental retardation that limits the exemption to those whose mental deficiencies are significant enough to be provable beyond a reasonable doubt.” Id. at 622 (emphasis added).[7]
The reasoning of the Georgia Supreme Court is contrary to the command of Atkins because the reasonable doubt standard, as applied to claims of mental retardation, necessarily will result in the deaths of mentally retarded individuals. In Atkins, the Court categorically prohibited the execution of mentally retarded offenders about whom there is a “national consensus” of lesser culpability. While it is true that Atkins left it to the states to develop ways to ensure that those mentally retarded offenders “about whom there is a national consensus” are not subject to capital punishment, 536 U.S. at 317, 122 S.Ct. 2242, the Court did not give the states unfettered authority to develop procedures that nullify the Eighth Amendment’s prohibition on the execution of the mentally *1278 retarded. Rather, the states were instructed to “develop! ] appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.” Id. (emphasis added) (quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). The discretion afforded the states, then, is not unbounded, and the means used to discriminate must be “appropriate.” Id.
Unquestionably, to define retardation as requiring an IQ of 30 or below would not be an “appropriate way” to enforce the command of Atkins. By the same token, it would not be an “appropriate” means to impose a burden of proof that is so insuperably high that it inevitably excludes from Atkins’ protection a substantial number of mentally retarded persons. Yet, because of the highly subjective nature of the factual inquiry necessary to establish mental retardation, that is precisely what Georgia’s once-pathbreaking statute effectively has done by requiring proof beyond a reasonable doubt.
Standards of proof often have powerful effects on the availability of a constitutional right. In judicial proceedings, certainty of a fact beyond any doubt cannot often be established. Nonetheless, disputed factual questions must be resolved. As Justice Harlan explained in his concurring opinion in In re Winship, “the factfinder cannot acquire unassailably accurate knowledge” of a given fact, but rather “can acquire ... a belief of what probably happened.” 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In this regard, “[t]he function of a standard of proof ... is to ‘instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.’ ” Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (quoting In re Winship, 397 U.S. at 370, 90 S.Ct. 1068 (Harlan, J., concurring)).
Inherent in the premise that we cannot achieve absolute certainty of the truth of a particular fact, is the corollary that “the trier of fact will sometimes, despite his best efforts, be wrong in his factual conclusions.” In re Winship, 397 U.S. at 370, 90 S.Ct. 1068 (Harlan, J., concurring). In a criminal case an erroneous factual conclusion can result in the conviction of an innocent person or in the acquittal of a guilty one and the standard of proof that we apply will affect whether the risk of an erroneous conclusion will more often fall on the side of convicting an innocent person or releasing a guilty one. Id. at 371, 90 S.Ct. 1068. Thus, depending on the relative importance of avoiding one false conclusion as opposed to the other, we decide how much risk of each of those wrong decisions we are willing to tolerate and who should bear that risk. For example, in those cases applying a preponderance of the evidence standard, we have decided that we are willing to tolerate a fair amount of risk of any wrong decision and that one party will bear a slightly higher amount of that risk than the other. As the Supreme Court has explained, “not only does the standard of proof reflect the importance of a particular adjudication, it also serves as a societal judgment about how the risk of error should be distributed between the litigants.” Cruzan v. Dir., Mo. Dep’t of Health, 497 U.S. 261, 283, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (internal quotation and citations omitted).
Accordingly, when a procedural scheme requires one party to bear the burden of establishing a particular fact by the most stringent standard of proof that our legal system recognizes — beyond a reasonable doubt — it reflects society’s desire that the party with the burden should bear the majority of the risk for an erroneous deci *1279 sion. For example, because individual liberty is extraordinarily valued, we place upon the government the burden of proving a defendant’s guilt beyond a reasonable doubt. In re Winship, 397 U.S. at 363, 90 S.Ct. 1068. “[T]he interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment.” Addington, 441 U.S. at 423, 99 S.Ct. 1804 (emphasis added).
This standard is established to protect the defendant at the expense of the government. By choosing the highest standard of proof — guilt beyond a reasonable doubt — and placing the burden of proof on the government, we make it clear that we will tolerate almost no error with respect to the reliability of the evidence leading to the deprivation of one’s liberty. This burden and standard of proof reflect society’s belief that “it is far worse to convict an innocent man than to let a guilty man go free,” In re Winship, 397 U.S. at 372, 90 S.Ct. 1068 (Harlan, J., concurring). A defendant’s liberty interest is greater in our society than the interest of the government in convicting and incarcerating guilty defendants. As the Supreme Court has noted:
There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value — as a criminal defendant his liberty — this margin of error is reduced as to him by the process of placing on the other party the burden of ... persuading the fact-finder at the conclusion of the trial of his guilt beyond a reasonable doubt.
Speiser v. Randall, 357 U.S. 513, 525-26, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).
In Atkins, the Court’s paramount concern with regard to the states’ procedures was that they protect the constitutional right of the mentally retarded not to be executed. See Atkins, 536 U.S. at 317, 122 S.Ct. 2242; see also Ford, 477 U.S. at 410, 106 S.Ct. 2595 (recognizing that federal constitutional standards dictate the adequacy of a state’s chosen procedures to uphold a substantive constitutional right). Yet, rather than securing the constitutional right at issue here — protecting the mentally retarded from execution — Georgia has done quite the opposite. By imposing the overwhelming majority of the risk of error on the defendant in its application of the most stringent standard possible, Georgia holds that it is far better to erroneously execute a mentally retarded person than to erroneously impose a life sentence on one not mentally retarded. Requiring a defendant to prove mental retardation beyond a reasonable doubt is appropriate only if the interests of a state in maximizing the number of death sentences outweigh the constitutional right of mentally retarded offenders not to be executed. This state interest, however, is not constitutionally permissible at the cost of violating the constitutional right of a mentally retarded offender not to be executed.
Atkins’s recognition of a national consensus against the-execution of the mentally retarded teaches that the constitutional right of the mentally retarded not to be put to death far transcends the state’s interest in carrying out a death punishment. Cf. Speiser, 357 U.S. at 525-26, 78 S.Ct. 1332. A state’s procedural safeguards must protect the offender’s superior right by precluding, to the extent reasonably possible, an erroneous conclusion that an offender is not mentally retarded. See Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion) (‘When a defendant’s life is at *1280 stake, the Court has been particularly sensitive to insure that every safeguard is observed.”); Woodson v. North Carolina 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion) (“Because of th[e] qualitative difference [between life imprisonment and punishment by death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.” (internal citation omitted)). This is accomplished by reducing the margin of error as to the offender whose life interest in a constitutional right not to be executed is at stake. As Justice Harlan explained, “[b]ecause the standard of proof affects the comparative frequency of ... erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each.” In re Winship, 397 U.S. at 371, 90 S.Ct. 1068. Atkins teaches us that there is a significantly greater “social disutility” in the occurrence of an erroneous factual determination that an offender is not mentally retarded. Accordingly, it is not constitutionally permissible to expect an offender who asserts mental retardation to bear the highest risk that our criminal justice system can impose of the erroneous conclusion that he is not mentally retarded.[8]
*1281 Indeed, as noted in Atkins, mentally retarded defendants are unable to contribute fully to their defenses, particularly having an under-developed conception of blameworthiness, a lack of knowledge of basic facts, and an increased susceptibility to the influence of authority figures. 536 U.S. at 318, 122 S.Ct. 2242. Thus, they are more likely to make false confessions, less likely to articulate and prove mitigation, less able to assist their attorneys, and more likely to make poor witnesses in their own defense. Id. at 320-21, 122 S.Ct. 2242. Atkins specifically cautioned that these impairments “can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants.” Id. at 306-07, 122 S.Ct. 2242.
Georgia’s formulation of the reasonable doubt standard as a means of prohibiting the execution of only those offenders who evidence a severe enough degree of mental retardation fundamentally misapprehends the function of a high standard of proof. Georgia views it as decreasing the risk of error that someone will be erroneously deemed mentally retarded when it actually only allocates to the offender the majority of the risk that he will be erroneously deemed not mentally retarded. This conception of the reasonable doubt standard, by its very terms, ensures that some, if not many, mentally retarded offenders will be executed in violation of the Eighth Amendment.
Moreover, when one considers the highly subjective nature of the inquiry into mental retardation — an inquiry that is often rife with doubt — it becomes even clearer that the reasonable doubt standard unquestionably will result in the execution of those offenders that Atkins protects. Mental retardation is a medical condition that is diagnosed only through, among other things, a subjective standard that requires experts to interpret the meaning of behavior observed over an extended period of time. Moreover, the definition of mental retardation includes degrees of mental retardation that range from mild to profound,[9] and wherever an offender falls within that range, there is bound to be some disagreement between the experts about the meaning ascribable to the offender’s conduct. Given the subjectivity that is necessarily involved in this medical diagnosis, which makes complete agreement among the experts a rarity, establishing mental retardation beyond a reasonable doubt for all offenders within the entire range of this classification is rendered a virtual impossibility.
Indeed, a lack of uniformity in the opinions of the experts is exactly what characterized Hill’s case, particularly in regard to the mental retardation criterion of deficits in adaptive skills functioning. At the evidentiary hearing in his state habeas case, Hill presented the testimony and written reports of several mental health experts who all agreed that he was mildly mentally retarded, whereas the state’s experts concluded that he was not. Most of these experts met personally with and evaluated Hill and all reviewed essentially the same documentation in forming their opinions. Yet in analyzing all of the available information in regard to adaptive skills functioning, the experts differed in their opinions as to whether the data demonstrated impairments consistent with mental retar *1282 dation. For example, Hill’s expert, Dr. Toomer, testified that the affidavits from friends, teachers, and family regarding Hill’s personal history, which described him as a loner, isolative and being unable to interact well with others in social situations, demonstrate a long-standing deficit in social interpersonal skills. The state’s expert, Dr. Carter, however, concluded that this same background information, while being suggestive of Schizoid Personality Disorder, ultimately falls short of such a diagnosis. Given the disagreement of the experts about the meaning to attribute to Hill’s behavior during his developmental period, the court concluded that Hill had not demonstrated impairments in adaptive behavior beyond a reasonable doubt. However, the state habeas court did find that this evidence supported the conclusion that Hill was more likely than not mentally retarded.[10]
The Supreme Court has specifically cautioned about the use of a high burden of proof when a factual determination involves medical or psychiatric diagnoses:
Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous .... The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical “impressions” drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient.
Addington, 441 U.S. at 429-30, 99 S.Ct. 1804 (internal citations omitted).
That caution applies with special force in the context of determining mental retardation. The legal criteria for this condition are derived from the definitions developed by both the American Association on Mental Retardation (now the American Association on Intellectual and Developmental Disabilities) and the American Psychiatric Association. The inquiry into whether an individual has exhibited sufficient deficiencies in his adaptive skills — the second prong of the three-pronged inquiry into mental retardation — is so inherently subjective and readily unclear that most cases will result in differences of opinion and divergent conclusions among psychiatric experts. Under these circumstances, only those offenders who are so severely mentally retarded that they are wholly unable to perform the most basic of adaptive behaviors in the opinion of all experts will be able to meet Georgia’s extraordinarily high burden. As such, Georgia’s procedural regime effectively eviscerates the substance of what qualifies as mental retardation. *1283 The “range of mentally retarded offenders about whom there is a national consensus,” Atkins, 536 U.S. at 317, 122 S.Ct. 2242, includes the mildly to the profoundly mentally retarded, id. at 308-309 & n. 3, 122 S.Ct. 2242; see also Diagnostic and Statistical Manual of Mental Disorders (4th ed.2000). Yet by limiting Atkins’s protection to those offenders whose “mental deficiencies are significant enough to be provable beyond a reasonable doubt,” Georgia has eviscerated the right announced in Atkins for all mentally retarded offenders, and thereby essentially has eliminated that constitutional right in Georgia for many mentally retarded offenders.[11]
IV. Conclusion
Atkins prohibits the execution of all mentally retarded defendants, not only the severe or profound mentally retarded, and it directs the states to create appropriate procedures that protect all of those individuals. The application of Georgia’s reasonable doubt standard will necessarily result in the deaths of mentally retarded offenders by incorrect identification. Plainly, that standard is not an “appropriate way” to vindicate a mentally retarded offender’s constitutional right not to be put to death. Applying the deference required under AEDPA, we hold that the conclusion reached by the Georgia Supreme Court— that the Eighth Amendment protects only those capital offenders whose retardation ls “significant enough” to be proven beyond a reasonable doubt — eviscerates the command of the Eighth Amendment that the mentally retarded shall not be executed, and is therefore “contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States” in Atkins. 28 U.S.C. § 2254(d)(1). Accordingly, we reverse the district court’s denial of Hill’s petition for writ of habeas corpus and remand for farther proceedings consistent with this opinion.
REVERSED AND REMANDED.

. Georgia has statutorily banned the execution of the mentally retarded since 1988. Ga. Code Ann. § 17-7-131(j).

. With regard to Hill's IQ, the court noted that "[a]ll quantitative I.Q. assessment results, except one, fall within the 'mild mental retardation’ range especially when allowing for variance.”

. Hill is not contesting Georgia's statutory definition of mental retardation which is in line with those definitions of the American Association on Mental Retardation (now the American Association on Intellectual and Developmental Disabilities) and American Psychiatric Association.

. Mental retardation includes four degrees of severity — mild, moderate, severe, and profound — based on an individual’s level of intellectual impairment. See Diagnostic and Statistical Manual of Mental Disorders (4th ed.2000); see also Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242.

. Contrary to the opinion expressed in the dissent, our conclusion that Atkins clearly establishes that a mentally retarded offender cannot be put to death is not in conflict with the United States Supreme Court's recent decisions in Renico v. Lett, - U.S. -, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010), Thaler v. Haynes, - U.S. -, 130 S.Ct. 1171, - L.Ed.2d - (2010), or Berghuis v. Smith, - U.S. -, 130 S.Ct. 1382, 176 L.Ed.2d 249 (2010). In those opinions, the Supreme Court did not alter the meaning of the term "clearly established,” but merely applied the rule that "[a] legal principle is 'clearly established’ within the meaning of [AEDPA] only when it is embodied in a holding of this Court.” Thaler, 130 S.Ct. at 1173. There can be no doubt that the holding of Atkins embodies the unambiguous principle that a mentally retarded capital defendant cannot be put to death.
Moreover, none of the three cases cited by the dissent addresses a situation such as the one we face here, where a state has utterly eviscerated a constitutionally granted right through severely limiting legislation. We do not read too much into Atkins in finding that a state court decision is contrary to a clearly established holding of the United States Supreme Court when that state court decision so circumscribes the command of the Eighth Amendment as to effectively nullify that holding.

. Of those states that impose the death penally, twenty-two states require the offender to prove his mental retardation by a preponderance of the evidence (Alabama, Arkansas, California, Idaho, Indiana, Louisiana, Maryland, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, Virginia, and Washington). Another four states—Arizona, Colorado, Florida, and Delaware—have adopted a clear and convincing standard. Three states, Connecticut, Kansas and Kentucky, and the federal government do not set a standard of proof. Georgia is the only state to require an offender to provide proof of mental retardation beyond a reasonable doubt.

. As the dissent does now, the court in Hill relied on the United States Supreme Court’s 1952 decision in Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), in which the Court approved the beyond a reasonable doubt standard for claims of insanity at the time of the crime. The Georgia Supreme Court reasoned accordingly that this same standard was constitutionally permissible for mental retardation claims. But, Leland is not applicable under its own terms. Leland’s holding was expressly premised on its acknowledgment that the case was not one in which the defendant "sought to enforce against the states a right which we have held to be secured to defendants in federal courts by the Bill of Rights.” 343 U.S. at 798, 72 S.Ct. 1002. Here, that is precisely what Hill seeks to do. And because Hill is seeking the protection of the Eighth Amendment, Leland is not applicable.

. The dissent points to a series of procedural rights that Georgia confers upon persons claiming mental retardation — the right to argue their cause, to present evidence, and to cross-examine witnesses — and says that these basic rights to be heard in an adversarial proceeding render Georgia’s scheme constitutional. In focusing on the defendant’s right to process, however, the dissent is blinded to the profound and unconstitutional constriction wrought by Georgia’s reasonable doubt standard upon the substantive right clearly recognized in Atkins. No matter the degree of procedural due process with which the mentally retarded defendant is provided, the hard fact is that he will rarely, if ever, be able to overcome the immense hurdle of demonstrating what is nearly always a subjective medical diagnosis beyond a reasonable doubt. No number of hearings or evidentiary opportunities can overcome the undeniable reality that mental retardation is not a matter that can usually be determined objectively and without powerful disagreement among experts.
The dissent also takes issue with the lack of empirical data in this record to support the fact that a reasonable doubt standard will too often preclude a finding of mental retardation where one is warranted. Concededly, we are aware of no such empirical data, and we assume that such data would be exceedingly difficult to produce. But such data are not required to prove the simple proposition of logic underlying our analysis. If there is any area in our criminal justice system that demonstrates the absence of "unassailably accurate knowledge,” In re Winship, 397 U.S. at 370, 90 S.Ct. 1068, it is the area of mental retardation, which turns on a purely qualitative and inherently subjective assessment of "impairments in adaptive behavior ... manifested during the developmental period.” Ga. Code Ann. § 17-7—131 (a)(3). Yet, the reasonable doubt standard denies Atkins relief whenever a fact-finder is unable to eliminate every "real possibility” that the defendant is not retarded under this qualitative and subjective standard. See Victor v. Nebraska, 511 U.S. 1, 27, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (Ginsburg, J., concurring in part and concurring in the judgment) (quoting with approval Federal Judicial Center, Pattern Criminal Jury Instructions, at 17-18 (reason able doubt instruction)). That standard necessarily would result in the execution of some individuals, like the petitioner in this case, who are "more likely than not” retarded. Indeed, even a petitioner who can prove retardation by clear and convincing evidence— evidence that is "unequivocal ... and convincing,” California ex rel. Cooper v. Mitchell Bros.’ Santa Ana Theater, 454 U.S. 90, 93 n. 6, 102 S.Ct. 172, 70 L.Ed.2d 262 (1981) (quoting C. McCormick, Evidence § 320, at 679 (1954)), and sufficient to produce in the mind of the fact-finder "a firm conviction of the truth,” United States v. Montague, 40 F.3d 1251, 1255 (D.C.Cir.1994)—could be executed under Georgia’s regime. The one certainty for mentally retarded petitioners, particularly those with mild mental retardation, is that it *1281 is exceedingly difficult to prove a subjective and qualitative test grounded in expert opinion beyond a reasonable doubt.

. In discussing the definition of mental retardation, the Court in Atkins noted that " 'mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.” 536 U.S. at 309 n. 3, 122 S.Ct. 2242 (citation omitted).

. We mention these specific portions of the evidentiary record in Hill’s case only to illustrate the highly subjective inquiry that must take place in diagnosing mental retardation. We note that the dissent makes numerous references to various pieces of the particular evidence that was presented to the state court regarding Hill's claim of mental retardation. However, the state of Georgia has explicitly stated that it is not challenging the state court's factual finding that Hill has established his mental retardation by a preponderance of the evidence. Moreover, we must accept the state court’s factual finding that Hill has shown he is mentally retarded by a preponderance of the evidence. Thus, much of the dissent's discussion of the evidentiary record is not relevant to the only legal question that was before the Georgia Supreme Court and is the only legal question before us here.

. The dissent says that we have "require[d] a preponderance of the evidence standard for mental retardation claims because a more stringent standard 'necessarily will result in the deaths of mentally retarded individuals ....’” See Dissenting Opinion of Hull, J., post, at note 20. We have imposed no such requirement. All we have done is recognize (1) that Atkins prohibits the execution of mentally retarded persons as to whom there is a "national consensus” of unsuitability for punishment by death, (2) that this "consensus” plainly includes the spectrum of retardation from mild to profound, and (3) that the reasonable doubt standard ensures the execution of individuals who are nonetheless part of the national consensus. We need not and do not decide whether, for example, the clear and convincing evidence standard, or any other, would produce similarly unconstitutional results. We hold only that Georgia’s requirement that a capital defendant must prove mental retardation beyond a reasonable doubt violates the command of Atkins.