In the Supreme Court of Georgia

Decided:   May 19, 2014

S14A0092.  OWENS et al. v. HILL

HINES, Presiding Justice.

This case presents the question of whether it is unconstitutional for the

State of Georgia to maintain the confidentiality of the names and other

identifying information of the persons and entities involved in executions,

including those who manufacture the drug or drugs to be used.[1]  We hold that

it is not, and we reverse the ruling of the Superior Court of Fulton County in

which it granted an interlocutory injunction prohibiting the execution of Warren

Lee Hill with a drug from a confidential source in order to consider that

question.

Hill was convicted of murdering a fellow inmate in the Lee County

Correctional Institute by beating him to death with a sink leg embedded with

---

[1] The State intended to use pentobarbital for Hill's scheduled execution, and the evidence that we discuss below addresses that particular drug.  Our holding here would apply to any other drug to the extent that such a drug might be comparable to pentobarbital in relevant ways.

nails. The jury sentenced him to death, and this Court affirmed. See *Hill v. State*, 263 Ga. 37 (427 SE2d 770) (1993). Hill has been unsuccessful in his multiple state and federal habeas proceedings. See *Turpin v. Hill*, 269 Ga. 302 (498 SE2d 52) (1998) (state habeas appeal); *Head v. Hill*, 277 Ga. 255 (587 SE2d 613) (2003) (state habeas appeal); *Hill v. Schofield*, 608 F3d 1272 (11th Cir. 2010) (federal habeas appeal in which a three-judge panel vacated Hill's death sentence); *Hill v. Schofield*, 625 F3d 1313 (11th Cir. 2010) (vacating the decision of the three-judge panel and ordering a rehearing en banc); *Hill v. Humphrey*, 662 F3d 1335 (11th Cir. 2011) (denying federal habeas relief on rehearing en banc), cert. denied, __ U. S. __ (132 SCt 2727, 183 LE2d 80) (2012); *In re Hill*, 715 F3d 284 (11th Cir. 2013) (denying Hill's request for permission to file a second federal habeas petition); *Hill v. Humphrey*, __ U. S. __ (133 SCt 1324, 185 LE2d 233) (2013) (denying a petition for a writ of certiorari arising out of second state habeas proceedings); *Hill v. Humphrey*, __ U. S. __ (134 SCt 115, 187 LE2d 84) (2013) (denying petition for a writ of certiorari arising out of third state habeas proceedings); *In re Hill*, __ U. S. __ (134 SCt 118, 187 LE2d 265) (2013) (denying an original petition for a writ of certiorari). Hill's case has also been before this Court two times previously on

issues related to the execution method in Georgia. See *Hill v. Owens*, 292 Ga. 380 (738 SE2d 56) (2013) (addressing the relationship of Georgia's Administrative Procedure Act to the selection of lethal injection drugs and dissolving a stay of execution previously issued by this Court); *Cook v. Owens*, Case No. S13W0834 (Feb. 21, 2013) (unpublished decision denying an application for discretionary appeal by Hill and others regarding the denial of an injunction against the prison pharmacy).

The sentencing court issued Hill's latest execution order on July 3, 2013, setting Hill's execution for the one-week period of July 13-20, 2013. See OCGA § 17-10-40 (providing for renewed execution orders). That execution order was filed after the July 1, 2013, effective date of a new law designating "identifying information" concerning the persons and entities that participate in executions, including those who participate in the procurement of execution drugs, to be a "confidential state secret." OCGA § 42-5-36 (d) (2).[2] Hill filed

---

[2] OCGA § 42-5-36 (d) (as amended effective July 1, 2013), referred to in the discussion below as the execution-participant confidentiality statute, provides as follows:

> (d) (1)  As used in this subsection, the term "identifying information" means any records or information that reveals a name, residential or business address, residential or business telephone number, day and month of birth, social security number, or professional qualifications.

suit in the Superior Court of Fulton County, naming the Commissioner of Corrections and others as defendants (hereinafter "the State") and seeking an interlocutory injunction, a permanent injunction, a declaratory judgment, a writ of mandamus, and "[s]ealed discovery of the identity of the compounding pharmacy and the supply chain and manufacturer(s) of any and all ingredients used to produce the lethal drug compound to be injected into Warren Hill." Hill alleged that the execution-participant confidentiality statute was unconstitutional on various grounds in that it wrongly denied him information revealing "the identities of the manufacturer, individuals or entities in the chain of supply, prescriber, compounding pharmacy, or pharmacist responsible for making the drugs available to the Department of Corrections for Mr. Hill's execution." Hill's complaint also stated that it was seeking "to enforce the prohibitions against cruel and unusual punishment under Georgia and Federal Law."

---

(2) The identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential and shall not be subject to disclosure under Article 4 of Chapter 18 of Title 50 or under judicial process. Such information shall be classified as a confidential state secret.

The Superior Court granted injunctive relief, which it described in various ways including as a stay of execution,[3] ruling that Hill had shown that there was a substantial likelihood of his success on several of his constitutional challenges to the statute. This Court granted the State's application for discretionary appeal[4] regarding the Superior Court's granting of injunctive relief and ordered the parties to address the following questions on appeal:

(1) Is this case moot due to the expiration of the compounded pentobarbital at issue and uncertainty as to whether and where the State will obtain pentobarbital to use if another execution date is scheduled for Hill?

(2) Considering that the Superior Court of Fulton County has neither appellate nor habeas jurisdiction to review the order of execution entered by the sentencing court, did it properly have jurisdiction to stay the order of execution entered by the sentencing court?

(3) Should questions about the constitutionality of OCGA § 42-5-36 (d) be avoided in light of the availability of other forms of discovery to Hill, by which Hill might, for instance, obtain

---

[3] We discuss the exact nature of the injunctive relief at issue in Division 2.

[4] The granting or denying of an interlocutory injunction is generally directly appealable. See OCGA 5-6-34 (a) (4). This case involves a form of interlocutory injunction, regardless of whether the relief granted was properly referred to by the parties and the Superior Court as a stay of execution. See *Zant v. Dick*, 249 Ga. 799, 799 (294 SE2d 508) (1982) (holding that a stay of execution is the equivalent of an interlocutory injunction, at least where there has been a hearing). However, under the Prisoner Litigation Reform Act, any appeal in a civil case that was initiated by a prisoner must come by discretionary application, regardless of which party is appealing. See *Ray v. Barber*, 273 Ga. 856, 856-857 (1) (548 SE2d 283) (2001) (applying OCGA § 42-12-1 et seq.).

5

production of a sample of the actual compounded pentobarbital to be used in his execution?

(4) Did the Superior Court of Fulton County err by granting a stay of Hill's execution based on his challenge to the constitutionality of OCGA § 42-5-36 (d)?

For the reasons set forth below, we conclude that this case is not moot, that the Superior Court had limited but valid jurisdiction over this matter, that the possible availability of forms of discovery beyond what is forbidden by the execution-participant confidentiality statute does not affect this case, that the execution-participant confidentiality statute is not unconstitutional, and that the Superior Court erred by granting what amounted to an interlocutory injunction. Accordingly, we reverse the Superior Court's ruling and dissolve the injunction that prohibited Hill's execution with a drug produced by undisclosed persons and entities.

1. The injunctive relief granted in this case enjoins the use of a specific batch of drugs from a specific, although undisclosed, compounding pharmacy. Because that batch of drugs has now expired and cannot be used in an execution, it is arguable that the question of the appropriateness of the injunctive relief has become moot. However, the parties agree that if this case were dismissed as

6

moot the State would once again obtain an execution drug and refuse to disclose its source, which the Superior Court would presumably enjoin the use of on the same grounds and which would expire before this Court were able to resolve the matter on appeal. Thus, this case presents a classic example of a matter that is capable of repetition yet evading review. See *Babies Right Start v. Ga. Dept. of Pub. Health*, 293 Ga. 553, 556 (2) (c) (748 SE2d 404) (2013) (noting the "well-established but narrow exception to mootness for disputes that are 'capable of repetition, yet evading review'" (quoting *Fed. Election Comm. v. Wisconsin Right to Life, Inc.*, 551 U. S. 449, 462 (II) (127 SCt 2652, 168 LE2d 329) (2007)). Accordingly, we will not dismiss this case as moot.

2. The execution order in this case was filed by the sentencing court, the court that conducted Hill's criminal trial. See OCGA § 17-10-40 (providing for renewed execution orders). The sentencing court's execution order in Hill's case contained nothing that dictated what drug or drugs should be used in his execution. In fact, it would have been inappropriate for the sentencing court's execution order to contain such details about the method of execution, because Georgia law specifically delegates the task of deciding such details to the Department of Corrections. See OCGA § 17-10-44 ("The Department of

Corrections shall provide a place for execution of the death sentence and all necessary apparatus, machinery, and appliances for inflicting the penalty of death."); *Hill*, 292 Ga. at 387 (2) (b) ("The Code imposes on the Commissioner and the Department a variety of duties specific to managing executions, among which choosing the drug or drugs is just one."). The issues of what drug or drugs will be used in Hill's execution, what person or entities are involved in procuring the drug or drugs, and how information about the drug or drugs is managed do not concern the validity of Hill's death sentence; instead, they concern merely *how* his death sentence will be carried out. Thus, Hill properly brought his claims regarding the procurement of the drug to be used in his execution and a possible injunction prohibiting the use of that *particular* drug against the state officers involved in those matters rather than making some sort of motion in the sentencing court maintaining jurisdiction over his sentence of death. Furthermore, venue was proper in the superior court of the county where those state officers were located, which was Fulton County. See OCGA § 9-10-30 ("All actions seeking equitable relief shall be filed in the county of the

8

residence of one of the defendants against whom substantial relief is prayed. . . .").[5]

Our reasoning here applies in a similar fashion to the question of whether this matter should have been raised in a habeas petition in the county where Hill is imprisoned. A challenge concerning the specific drug or drugs to be used to carry out a sentence of death is analogous to a challenge to the conditions of confinement meted out by a state officer under the authority of a sentence of imprisonment. Neither such challenge attacks a criminal sentence itself. Instead, each attacks only the *manner* in which a state officer may choose to enforce a criminal sentence. See *McNabb v. Commr. Ala. Dept. of Corr.*, 727 F3d 1334, 1344 (IV) (C) (11th Cir. 2013) ("Usually, an inmate who challenges a state's method of execution is attacking the means by which the State intends to execute him, which is a circumstance of his confinement. It is not an attack on the validity of his conviction and/or sentence."). A habeas petition may only

---

[5] This Court has previously addressed claims regarding specific methods of lethal injection as part of sentencing court proceedings; however, this Court has never discussed the jurisdiction of those sentencing courts to address the issue. See, e.g., *Rice v. State*, 292 Ga. 191, 211-212 (10) (733 SE2d 755) (2013) (addressing the constitutionality of a particular method of lethal injection on direct appeal). See *State v. Outen*, 289 Ga. 579, 582 (714 SE2d 581) (2011) (holding that jurisdictional issues not discussed on appeal in one case do not constitute precedent in later cases regarding such jurisdiction).

9

allege constitutional defects in a conviction or sentence itself, not defects in the manner in which a sentence is carried out by various state officers. See OCGA § 9-14-42 (a) ("Any person imprisoned by virtue of a sentence imposed by a state court of record who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of this state may institute a proceeding under this article [governing habeas petitions].") Accordingly, we hold that challenges to the choice of drug or drugs to be used to carry out death sentences, which choice again is the responsibility of the Department of Corrections, along with related claims concerning the manner in which such drugs are procured and how information about the procurement process is managed, should be raised against the state officers responsible for such matters in the superior court where venue is appropriate for suit against them, rather than in a habeas court. See *Hill v. McDonough*, 547 U. S. 573, 580 (II) (126 SCt 2096, 165 LE2d 44) (2006) (holding that federal lethal injection claims should be brought in a civil rights action rather than as a habeas claim).[6]

---

[6] Our previous decisions assumed that claims regarding specific methods of lethal injection were appropriately raised in the habeas court; however, we never discussed the question of the habeas court's jurisdiction. See, e.g., *Hall v. Terrell*, 285 Ga. 448, 457 (III) (679 SE2d 17) (2009).

We emphasize, however, that the Superior Court of Fulton County is the appropriate court under circumstances like this only insofar as that court might enjoin state officers over which it has personal jurisdiction from using or directing the use of a specific drug or drugs to carry out a death sentence or might order those state officers to disclose related information within their control. An injunction in a case like this is legally different from a stay of the sentencing court's execution order, even if the practical result in a given case might be the same. See *Hill*, 547 U. S. at 580-581 (II) ("[Clarence] Hill's challenge appears to leave the State free to use an alternative lethal injection procedure. Under these circumstances a grant of injunctive relief could not be seen as barring the execution of [Clarence] Hill's sentence."). Under such circumstances, rulings of the Superior Court of Fulton County may affect the immediate feasibility of the State's carrying out the sentencing court's execution order insofar as enjoining the use of a *particular* drug or drugs could, as happened here, *incidentally* complicate or delay the State's ability to comply with the sentencing court's order. But it is not a direct stay of the execution

---

See *Outen*, 289 Ga. at 582 (holding that jurisdictional issues not discussed on appeal in one case do not constitute precedent in later cases regarding such jurisdiction).

order itself. Compare OCGA § 9-5-2 ("Equity will take no part in the administration of criminal law. It will neither aid criminal courts in the exercise of their jurisdiction, nor will it restrain or obstruct them."). However, we hold that, under the right circumstances, the Superior Court of Fulton County would have the authority in protecting its own jurisdiction to enjoin state officers over which it has personal jurisdiction from using or directing the use of specific drugs in an execution. See Ga. Const., Art. VI, Sec. I, Par. IV ("Each court may exercise such powers as necessary in aid of its jurisdiction or to protect or effectuate its judgments. . . ."). Such circumstances obtain here, because there would be no other means of seeking an adequate remedy in the sentencing court. Nevertheless, because the Superior Court erred by purporting, at least in part, to issue a stay of the sentencing court's execution order, we would at a minimum need to remand this case for that court to correct its mischaracterization of what should have been described as an interlocutory injunction barring the State only from using or directing the use of the specific drug at issue. However, as the discussion below explains, we hold that no injunctive relief of any kind was justified in this case and, therefore, we need not remand the case for clarification of the particular form of relief at issue.

12

3. We asked the parties to address whether the constitutional questions at issue in this case could be avoided by providing Hill with forms of discovery not forbidden by the execution-participant confidentiality statute, such as providing him with a sample of the drug to be used in his execution. We suppose that there could be serious questions about the constitutionality of the confidentiality statute as applied to a case in which the plaintiff came much closer to presenting a colorable claim under *Baze v. Rees*, 553 U. S. 35 (128 SCt 1520, 170 LE2d 420) (2008), which we discuss below. In a case in which the information shielded by the statute were the only essential missing link for the plaintiff in his or her proof of an Eighth Amendment claim – that is, a case in which, but for the unavailability of that information, the record shows that the plaintiff could make out a claim under the *Baze* standard – claims that the statutory shield was unconstitutional might be more viable. Even in such cases, however, the superior court would have an obligation to consider whether the difficult constitutional questions might properly be avoided. If other available and feasible means of discovery could afford a reasonable and adequate opportunity for the plaintiff in such a case to establish the missing link – production of a sample of the drug for independent testing, for example – the availability of

13

such discovery mechanisms might well be sufficient to avoid any difficult constitutional questions. That said, we do not mean to suggest that such discovery should be routinely available. It would be necessary only in cases in which the plaintiff had made out a strong Eighth Amendment claim, more detailed information about the manufacturing of the drug were the essential missing link in his or her proof of that claim, and the discovery sought were reasonably likely to supply the missing link. For the reasons explained more fully below, we conclude that this is no such case.

4. Finally, we address whether the Superior Court of Fulton County erred by granting what was in effect an interlocutory injunction barring the State's use of his execution drug based on Hill's constitutional claims. His constitutional claims concerned the nature of that drug and the statute requiring that identifying information regarding the persons and entities involved in executions, including those involved in the procurement of execution drugs, must be maintained in confidence. In determining whether to grant an interlocutory injunction, a trial court should consider whether

> (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the

injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of [his or] her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

*SRB Investment Svcs, LLLP v. Branch Banking and Trust Co.*, 289 Ga. 1, 5 (3) (709 SE2d 267) (2011) (citation omitted). A trial court has discretion in deciding whether to grant an interlocutory injunction, but that discretion is abused when it is based on a misunderstanding or a misapplication of the law. *Holton v. Physician Oncology Svcs., LP*, 292 Ga. 864, 866-867 (2) (742 SE2d 702) (2013). For the reasons discussed below, we conclude that the Superior Court abused its discretion in granting what amounted to an interlocutory injunction in this case.

(a) *Introductory Matters.* We begin our discussion of the interlocutory injunction by providing additional detail regarding Hill's arguments and the evidence that he raised in support of it, arguments that the following discussion and citations to other courts show to be meritless. Pivotal here, we believe, is the fact that each of Hill's arguments *ultimately* centers on his claim that there is an unconstitutional risk that his execution will amount to cruel and unusual

punishment.[7]  That underlying claim was raised in a somewhat hypothetical

fashion in light of Hill's argument that he was denied identifying information

about the manufacturer of his execution drug that might have allowed additional

clarity to the claim.  However, whether raised directly or in a somewhat

hypothetical fashion, such a claim must include a showing that satisfies the

following threshold requirements set forth by the Supreme Court of the United

States:

> Our cases recognize that subjecting individuals to a risk of future harm – not simply actually inflicting pain – can qualify as cruel and unusual punishment.  To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be "sure or very likely to cause serious illness and needless suffering," and give rise to "sufficiently imminent dangers." *Helling v. McKinney*, 509 U.S. 25, 33, 34-35, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993) (emphasis added).  We have explained that to prevail on such a claim there must be a "substantial risk of serious harm," an "objectively intolerable risk of harm" that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

*Baze*, 553 U. S. at 49-50 (II) (B) (controlling plurality opinion).[8]  See *O'Kelley*

---

[7] Hill's complaint stated that it was brought "to enforce the prohibitions against cruel and unusual punishment under Georgia and Federal Law."

[8] The State claimed in the Superior Court that it had obtained independent laboratory testing to verify the efficacy of the drug produced by the compounding pharmacy, and it provided a redacted copy of the report to Hill.  Such additional safety measures, if properly demonstrated, would tend

16

*v. State*, 284 Ga. 758, 769-770 (4) (670 SE2d 388) (2008) (equating Georgia and federal constitutional rights regarding the method of lethal injection).

The parties agree that the State willingly provided Hill with information indicating that Hill's execution drug had been manufactured by a compounding pharmacy, which is a type of pharmacy that produces individually-produced medications according to the directions provided in individual prescriptions written by physicians. Hill's expert admitted that "somewhere around 3 to 4 percent of all drugs dispensed in the U.S. are compounded." Hill's expert alleged that the drugs produced by compounding pharmacies, which are overseen by state governments rather than the FDA, are of less reliable quality than drugs produced by major manufacturers. However, he also admitted that "[n]o one knows" what percentage of the drugs produced by compounding pharmacies are contaminated. He cited a study by the FDA from 2006 that

---

to counter a prisoner's attempt to show that whatever risk of harm at issue "prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment [Cit.]." *Baze*, 553 U. S. at 50 (II) (B). We need not address this matter, however, because our discussion of the nature of compounding pharmacies, which is where Hill's drug was obtained, resolves the case. Also, "[a petitioner] must show that the risk is substantial when compared to the known and available alternatives." *Baze*, 553 U. S. at 61 (III) (B). Hill argues that the alternative in his case would be the use of a pharmacy governed by the Federal Drug Administration. We need not address the viability or preferability of this alternative, because we conclude that a compounding pharmacy is an appropriate source for execution drugs.

concluded that 34 percent of the "sterile products" produced by certain compounding pharmacies that it had surveyed were contaminated. However, even accepting this figure regarding the contamination of "sterile products," the fact remains that sterility is simply a meaningless issue in an execution where, as the record showed, unconsciousness will set in almost instantaneously from a massive overdose of an anesthetic, death will follow shortly afterward before consciousness is regained, and the prisoner will never have an opportunity to suffer the negative medical effects from infection or allergic reactions from a possibly non-sterile drug. Particularly unpersuasive is Hill's expert's testimony that certain contaminants also could have the following effect: "Their blood pressure would drop precipitously, and ultimately it's possible that they could die." Such a side effect obviously would be shockingly undesirable in the practice of medicine, but it is certainly not a worry in an execution. He also testified that, with the passage of time following the administration of a contaminated drug, someone's temperature could rise, leading to seizures. However, once again, such a side effect would be irrelevant in an execution inducing nearly instantaneous unconsciousness and the rapid onset of death before consciousness is regained. As to other possible defects with Hill's

18

execution drug, Hill's expert speculated about possible problems such as visible precipitates that might form as a result of improper pH and that, if large enough, might cause intravenous pain or a pulmonary embolism upon injection, a lack of potency resulting in a lessened effect per dose, and super-potency leading to complications. However, Hill's expert gave no clear indication regarding the level of risk involved, and each of these possible complications appears to be unlikely to occur, likely identifiable by the compounding pharmacy preparing the drugs and/or by the person injecting the drug, and/or irrelevant in light of the massiveness of the dose of the anesthetic involved. This lack of clear testimony about the level of risk involved should, we believe, be set against the fact that the execution drug, pentobarbital in this case, is not an uncommon drug and was produced in the type of pharmacy that is responsible for filling millions of prescriptions per year in this country. See *Sells v. Livingston*, 2014 U.S. App. LEXIS 6128, at *6 (5th Cir. 2014) (precedential effect limited by court rule) ("If the State here were using a drug never before used or unheard of, whose efficiency or science was completely unknown, the case might be different."), cert. denied and stay denied, 2014 U.S. LEXIS 2393 (April 3, 2014). Hill's expert also complained that compounding pharmacies regularly use ingredients

19

obtained in bulk from sources, sometimes foreign, that are not approved by the FDA to supply ingredients to major manufacturers. To this point he stated in a written declaration that was attached to Hill's complaint that "no amount of finished product testing can build quality into the product," and he echoed and explained this idea at the evidentiary hearing as follows: "What happens when you're only testing the final finished product is that that can be due purely to luck, not because it's a high quality product and so the whole process. [sic]" However, his focus in making these statements was at least largely on "sterility," which again is simply irrelevant in the context of an execution. Furthermore, we again note that compounding pharmacies fill millions of prescriptions each year for medical use, which places Hill's indictment of them as an industry into a highly unfavorable perspective.

Thus, even fully crediting Hill's factual claims regarding compounding pharmacies, this case presents merely the fact that there is some risk that a lack of sterility could lead to symptoms that are irrelevant to a person being executed, that there is an undetermined risk that a compounding pharmacy acting in its routine role of producing a well-known medication according to the directions in a prescription will fail to produce an effective drug free of visible precipitates,

20

and that there is an undetermined risk that, despite the fact that the compounding pharmacy might determine that it has produced an effective drug for Hill's execution, its success would be "due purely to luck" and would not necessarily be indicative that the pharmacy is likely to produce the same quality of drug for the typical persons using its drugs, namely medical patients. Furthermore, Hill has utterly failed to show with any specificity how learning the identity of the specific compounding pharmacy involved in his case, even assuming that it has had problems producing some medications in the past, would substantially improve his factual showing in support of his underlying Eighth Amendment claim. In this light and in view of Hill's ultimate burden to show that the drug to be used in his execution creates a "substantial risk of serious harm," is "sure or very likely to cause serious illness and needless suffering," or is likely to create "sufficiently imminent dangers" in a way that shows an "intolerable risk of harm" that prevents the State from asserting that it is "subjectively blameless for purposes of the Eighth Amendment," *Baze*, 553 U. S. at 49-50 (II) (B) (controlling plurality opinion) (citation and punctuation omitted), we now turn to an application of the standards for an interlocutory injunction.

21

(b) *Threat to the Moving Party.* As we noted above, the essential threat to Hill in this case, if any, is the threat that his execution would amount to unconstitutionally cruel and unusual punishment. This threat must be measured by the legal standard that would be applied to such a claim if it were more fully litigated and by the quality of Hill's showing that he ultimately could support such a claim factually. As the discussion of Hill's factual presentation in the Superior Court above demonstrates, Hill's factual assertions fall far short of satisfying the legal standard applied under the Eighth Amendment, which involves a showing of a "substantial risk of serious harm" that is "sure or very likely to cause serious illness and needless suffering." *Baze*, 553 U. S. at 49-50 (II) (B) (controlling plurality opinion) (citation and punctuation omitted). In this regard we echo the Supreme Court of the United States in holding that such "speculation" regarding a possible threat of harm to Hill was insufficient to support an interlocutory injunction. *Brewer v. Landrigan*, __ U. S. __, __ (131 SCt 445, 178 LE2d 346) (2010) (vacating a temporary restraining order that was based on the claim that a drug from a foreign source created an unconstitutional risk of harm to the prisoner). See also *Powell v. Thomas*, 784 FSupp.2d 1270, 1283 (B) (2) (M.D. Ala. 2011) ("Given the failure of Williams to establish a

substantial likelihood that he can succeed on his claim that the use of pentobarbital will 'very likely . . . cause serious illness and needless suffering,' *Baze*, 553 U.S. at 50, resulting in a substantial risk of serious pain, the irreparable injury is not actual and imminent.").

(c) *Harm to the Party to be Enjoined.* As the Superior Court correctly noted, quoting from the Supreme Court of the United States, "[t]he State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill*, 547 U. S. at 584 (III). Thus, this factor weighs against Hill's request for an interlocutory injunction.

(d) *Likelihood of Success on the Merits.* The Superior Court ruled on multiple grounds[9] that Hill had shown a substantial likelihood of success on the merits of his constitutional claims, which each *ultimately* pointed back to his underlying claim, even though that underlying claim was hypothetically and/or conditionally presented, that his execution with drugs manufactured by an undisclosed compounding pharmacy would violate the constitutional ban on

_____

[9] We note that not all of the constitutional sub-claims discussed by the parties on appeal were ruled upon by the Superior Court. However, under the present circumstances we deem it appropriate in the interest of judicial economy to resolve these related matters of law on appeal. See *Mason v. Home Depot U.S.A., Inc.*, 283 Ga. 271, 277 (3) (658 SE2d 603) (2008).

23

cruel and unusual punishment.  In light of the discussion above, we conclude that none of these constitutional claims has any merit.

(1) *Access to the Courts and Due Process.*  The Superior Court ruled that the execution-participant confidentiality statute, OCGA § 42-5-36 (d) (as amended effective July 1, 2013), denied Hill the right to access to the courts and due process.  See *Bounds v. Smith*, 430 U. S. 817 (97 SCt 1491, 52 LE2d 72) (1977) (recognizing prisoners' federal constitutional right to access to the courts).  See also *Smith v. Baptiste*, 287 Ga. 23, 24-25 (1) (694 SE2d 83) (2010) (holding that the Georgia Constitution lacks any *express* provision creating a right to access to the courts); *Nelms v. Georgian Manor Condo. Ass'n.*, 253 Ga. 410, 413 (3) (321 SE2d 330) (1984) ("While it is axiomatic that an individual must have access to the courts in order to assert the right to self-representation provided by Art. I, Sec. I, Par. XII, we decline to give this constitutional provision the expansive interpretation sought by appellant.").  We agree with the following reasoning of the Court of Appeals for the Fifth Circuit regarding how such claims should be resolved:

> [P]laintiffs' access-to-the-courts argument still hinges on their ability to show a potential *Eighth Amendment* violation.  One is not

> entitled to access to the courts merely to argue that there might be some remote possibility of some constitutional violation.

*Whitaker v. Livingston*, 732 F3d 465, 467 (I) (5th Cir. 2013). Said simply, *losing* in court is not the same as being denied access to the courts. See also *Schad v. Brewer*, 2013 U.S. Dist. LEXIS 145387, at *29 (VI) (D. Ariz. 2013) ("Because Plaintiffs do not have a constitutional right to assess whether they have a claim, they have failed to state a claim for denial of access to the courts in violation of their due process rights."). The fact is that Hill's "claim concerning lack of access to the courts is belied by the proceedings below and the instant appeal." *Goddard v. City of Albany*, 285 Ga. 882, 886 (4) (684 SE2d 635) (2009). As to his due process claim, his lack of success here, having had full consideration of his case by the Superior Court in the first instance and then this Court on appeal, stems not from a lack of access to the courts or to due process but, instead, simply from the fact that he failed to show that obtaining the requested information would allow him to make a colorable claim. See *Clemons v. Crawford*, 585 F3d 1119, 1129 n.9 (II) (C) (8th Cir. 2009) ("[W]e

have located no authority indicating the prisoners have such a due process right to probe into the backgrounds of execution personnel.").[10]

(2) *Supremacy Clause and Separation of Powers.* Our resolution of Hill's arguments based on the Supremacy Clause[11] and on the constitutional separation of powers[12] between the legislative branch and the judicial branch follows a similar logic. There is no doubt that a statute enacted by the General Assembly that denied Hill his constitutional right to be free from cruel and unusual punishment and improperly interfered with the power of the judiciary

---

[10] The dissent asserts that the execution-participant confidentiality statute "has the effect of creating the very secret star chamber-like proceedings in which this State has promised its citizens it would not engage." Dissent, p. 2. We reject this accusation, because Hill has had free and open access to the court system in Georgia and because his failure to prevail in court has been due simply to the fact that his claims are so speculative and unfounded.

[11] The Supremacy Clause of the Constitution of the United States provides as follows:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U. S. Const. Art. VI.

[12] The Georgia Constitution provides as follows:

The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided.

Ga. Const. of 1983, Art. I, Sec. II, Par. III.

26

to enforce that right would present serious questions regarding the unquestionable rule that constitutional provisions take supremacy over legislative enactments when the two are in irreconcilable conflict and that the judiciary has an independent, constitutionally-mandated role to ensure that the constitution is enforced when it is in conflict with a legislative enactment. See *Head v. Stripling*, 277 Ga. 403, 404 (1) (590 SE2d 122) (2003) (noting that a defendant's constitutional right to present mitigating evidence trumps the confidentiality law applicable to records maintained by the State Board of Pardons and Paroles). However, the failure of Hill's claims here does not stem from any constitutional defect in the role of the judiciary brought about by the execution-participant confidentiality statute; instead, as discussed above, the failure of his claims stems simply from the fact that he failed to make any claims that could merit relief. See *Whitaker*, 732 F3d at 467 (I) (addressing a Supremacy Clause claim and stating, "this claim, too, rises and falls with the *Eighth Amendment* claim").

(3) *First Amendment.* The Superior Court concluded that the execution-participant confidentiality statute violated the First Amendment guarantee of free speech. Unlike most First Amendment issues, which concern

27

restrictions on the freedom to disseminate information already within one's *own* possession, the issue here concerns the State's refusal to disclose information within *its* control. The Supreme Court of the United States has held:

> The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination.

*Florida Star v. B.J.F.*, 491 U. S. 524, 534 (II) (109 SCt 2603, 105 LE2d 443) (1989). See also *McBurney v. Young*, __ U. S. __ (133 SCt 1709, 185 LE2d 758) (2013) ("This Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA [Freedom of Information Act] laws."); *Houchins v. KQED, Inc.*, 438 U. S. 1, 9 (III) (98 SCt 2588, 57 LE2d 553) (1978) (addressing the alleged right of the media to enter prisons and stating: "This Court has never intimated a First Amendment guarantee of a right of access to all sources of information under government control."). To the extent that Hill seeks to turn the First Amendment into an Open Records Act for information relating to executions, his claim clearly fails.

However, the Supreme Court has also held that certain limited forms of government proceedings must be held open to the public under First

28

Amendment principles, and it has held that the test for whether the First Amendment attaches to a given governmental proceeding involves an assessment of (1) whether access has been granted historically and (2) whether public access would play a positive role in the functioning of the process. See *Press-Enterprise Co. v. Superior Court of California for the County of Riverside*, 478 U. S. 1, 10-12 (IV) (A) (106 SCt 2735, 92 LE2d 1) (1986). The Supreme Court has also noted:

> Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly.

Id. at 478 U. S. 1, 8-9 (III). Even adopting the extravagant view that the acquisition of execution drugs is a government process subject to this test, we still conclude that Hill's claims fail to satisfy either of these elements. First, although there has been a tradition of allowing at least some public access to execution proceedings, there has also been a longstanding tradition of concealing the identities of those who carry out those executions. See *California First Amendment Coal. v. Woodford*, 299 F3d 868, 876 (I) (A) (9th Cir. 2002) ("Thus, there is a tradition of at least limited public access to

executions."); Ellyde Roko, *Executioner Identities: Toward Recognizing a Right to Know Who Is Hiding Beneath the Hood*, 75 Fordham L. Rev. 2791, 2829 (2007) (arguing for a different practice but acknowledging that, "[h]istorically, executioners have hidden behind a hood – both literally and figuratively").

The reasons for offering such privacy are obvious, including avoiding the risk of harassment or some other form of retaliation from persons related to the prisoners or from others in the community who might disapprove of the execution as well as simply offering those willing to participate whatever comfort or peace of mind that anonymity might offer. Although the identity of the executioner who actually inflicts death upon the prisoner is the most obvious party in need of such protection, we believe that the same logic applies to the persons and entities involved in making the preparations for the actual execution, including those involved in procuring the execution drugs.

Second, without the confidentiality offered to execution participants by the statute, as the record and our case law show, there is a significant risk that persons and entities necessary to the execution would become unwilling to participate. See *Hill*, 292 Ga. at 387 (2) (b) ("Due to litigation challenging

30

existing methods of execution and due to other factors, both judicial *and non-judicial*, that have affected the availability of certain drugs, the Commissioner has recently found it necessary or wise to make repeated changes to the lethal injection procedures employed by the Department." (emphasis supplied)). See also *Whitaker v. Livingston*, 2013 U.S. Dist. LEXIS 144367, \*7-8 (S.D. Tex. 2013) (noting the *prisoner's* allegation that the compounding pharmacy was demanding the return of the execution drugs that it had supplied to the State of Texas "because it was being harassed"). We are mindful of Hill's argument about enhancing the public debate on the death penalty in general and on the participation of specific persons and entities in executions in particular, and we recognize that disclosing the compounding pharmacy that produces lethal injection drugs might enhance the ability of Hill and the general public to more fully satisfy themselves that Georgia's method of execution is humane. However, we conclude that Georgia's execution process is likely made more timely and orderly by the execution-participant confidentiality statute and, furthermore, that significant personal interests are also protected by it. Accordingly, we also conclude that it therefore, on balance, plays a positive role in the functioning of the capital punishment process. See *Philadelphia Inquirer*

*v. Wetzel*, 906 FSupp.2d 362, 368 (III) (A) (M.D. Penn. 2012) (addressing a First Amendment claim regarding access to the sights and sounds inside the execution chamber and setting forth factors that might affect a court's assessment of whether public access would play a positive role in the functioning of the process). Because Hill has failed both tests for whether a First Amendment right applies to the discovery of the identity of the participants in his execution, including those involved in the procurement of his execution drugs, we need not address his arguments regarding the appropriate level of restriction that would apply if such a right existed. Compare *Press-Enterprise Co.*, 478 U. S. at 13-15 (IV) (B) ("Since a qualified *First Amendment* right of access attaches to preliminary hearings in California . . . the proceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.' [Cit.]"); *California First Amendment Coal.*, 299 F3d at 877-879 (II) (determining the proper level of scrutiny to be applied where the First Amendment had been found to apply to the viewing of the escorting of the prisoner into the execution chamber and the placement of the intravenous ports).

32

5.  In light of the foregoing, the Superior Court's ruling granting what amounted to an interlocutory injunction is reversed, and the case is remanded for further proceedings on the merits not inconsistent with this opinion.

Judgment reversed and case remanded.  All the Justices concur, except Benham and Hunstein, JJ., who dissent.

S14A0092.  OWENS et al. v. HILL

BENHAM, dissenting.

On April 29, 2014, Clayton D. Lockett died of a massive heart attack. Unlike most people, Lockett knew when he would die because he was scheduled to be executed by the State of Oklahoma.  Known to Lockett was the fact that he would be injected with a combination of three drugs to exact his death. Unknown to Lockett and his attorneys, despite their calls for transparency, was the source of any of the three drugs.  During the attempted execution, Lockett's veins failed, he reportedly twitched and mumbled, even after having been declared unconscious,[1] and, although officials attempted to halt the execution, Lockett died forty-three minutes after the first drug had been administered.[2] Unknown to us all, at least at the time of this writing, is why the execution did not go as planned.[3]

---

[1]  "Mr. Lockett's apparent revival and writhing raised questions about the doctor's initial declaration that he was unconscious and are sure to cast doubt on the effectiveness of the sedative used."  Eckholm, Erik, *One Execution Botched, Oklahoma Delays the Next*, The New York Times (April 29, 2014).

[2]The execution began at 6:23 p.m. and Lockett was declared dead at 7:06 p.m.  McBride, Bailey Elise and Murphy, Sean, *Oklahoma Inmate Dies After Execution is Botched*, The Associated Press  (April 30, 2014).

[3]"Madeline Cohen, a federal public defender..., said that while prison officials asserted that the problem was only with the intravenous line, 'unless we have a full and independent investigation,

I write because I fear this State is on a path that, at the very least, denies Hill and other death row inmates their rights to due process and, at the very worst, leads to the macabre results that occurred in Oklahoma. There must be certainty in the administration of the death penalty. At this time, there is a dearth of certainty namely because of the scarcity of lethal injection drugs. Georgia's confidential inmate state secret statute does nothing to achieve a high level of certainty. Rather, the law has the effect of creating the very secret star chamber-like proceedings in which this State has promised its citizens it would not engage. See <u>State v. Brown</u>, 293 Ga. 493 (1) (748 SE2d 376) (2013). As this Court stated in <u>Atlanta Journal v. Long</u>, 258 Ga. 410 (1) (369 SE2d 755) (1988), "[J]ustice faces its gravest threat when courts dispense it secretly. Our system abhors star chamber proceedings with good reason." The fact that some drug providers may be subject to harassment and/or public ridicule and the fact that authorities may find it more difficult to obtain drugs for use in executions

---

we'll never know.'" Eckholm, Erik, *One Execution Botched, Oklahoma Delays the Next*, <u>The New York Times</u> (April 29, 2014).

are insufficient reasons to forgo constitutional processes in favor of secrecy, especially when the state is carrying out the ultimate punishment.[4]

The majority reasons that Hill has not shown the statute to be unconstitutional under the present circumstances because his claims regarding the specific drug that the State will use to execute him are merely speculative. Admittedly, speculative claims regarding deficiencies in an execution drug are insufficient to sustain a claim of cruel and unusual punishment.  See Brewer v. Landrigan, __ U. S. __, __ (131 SCt 445, 178 LE2d 346) (2010).  However, the speculation permeating Hill's claims arises solely from the State's unwillingness, in light of the secrecy statute, to disclose information that would allow him to make more specific claims.

Hill presented expert testimony showing that compounding pharmacies are not regulated by the FDA, as are ordinary manufacturers of prescription drugs, that a significant number of compounding pharmacies have produced defective drugs in the past, and that a compounding pharmacy, in producing a

---

[4]"Such secrecy undermines the public's faith in the integrity of the justice system as it conceals from the public, lawyers, and those facing execution critical information about the lawfulness and reality of states' execution procedures." The Constitution Project, *Irreversible Error: Recommended Reforms for Preventing and Correcting Errors in the Administration of Punishment*, p. 141 (2014). [See www.constitutionproject.org]

specific batch of drugs for an execution, could produce drugs that would inflict great suffering on Hill. Much like the State of Oklahoma did in regard to the drugs used in the attempted Lockett execution, in this case the State has only made baseline assurances that the compounding pharmacy it used was able to produce a high quality execution drug. These assurances amount to little more than hollow invocations of "trust us."[5] While the State produced a redacted laboratory report from an independent laboratory that it claimed had tested Hill's execution drug, Hill, without knowing even the name of the laboratory, was left again with little more than the State's invocation of "trust us."

This Court has held that a statutory provision declaring information to be a state secret must yield to constitutional due process demands. See Head v. Stripling, 277 Ga. 403, 408-409 (1) (C) (590 SE2d 122) (2003) (noting that a defendant's constitutional rights trump statutory secrecy laws applicable to information about the Board of Pardons and Paroles). Admittedly, that holding was in the context of a Brady evidence suppression claim, a type of claim not

---

[5]See also Land, Greg, *Oklahoma's Botched Execution is a Wake-Up Call in Georgia, Says Law Professor*, Daily Report (May 1, 2014), quoting Professor Michael Mears as follows: "The defense bar is ...about protecting the Constitution. How do we know what [drugs] they're using and not telling us about?"

4

directly applicable here because it concerns trial rights. See id. (citing Brady v. Maryland, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963)). However, I find that the general due process concerns at work in Brady naturally apply in this context. Accordingly, I would hold that it is a violation of due process to reject Hill's cruel and unusual punishment claim as speculative while simultaneously denying him the means by which he has any hope of proving that claim. See Sepulvado v. Jindal, 739 F3d 716, 721-722 (II) (5th Cir. 2013) (Dennis, J., dissenting) (addressing a last-minute change to an execution protocol and relying on "the general principles that changing and keeping secret the details of a pending execution offends the basic constitutional principle of fair notice. . . ."); Hoffman v. Jindal, 2014 U.S. Dist. LEXIS 3025, at *12-13 (M.D. La. 2014) (expressing disapproval of the State's concealment of details of the prisoner's impending execution but following "binding precedent" in the jurisdiction that barred relief).

In light of my assessment of Hill's due process claim, I would grant him access to information identifying the compounding pharmacy that produces his execution drug; although, I would direct that the information be released under appropriate safeguards to minimize any harm to individuals who are simply

5

performing their jobs. See <u>Zink v. Lombardi</u>, 2014 U.S. App. LEXIS 3602, at *4 (8th Cir. 2014) (Bye, J., dissenting) ("Even if Missouri had provided basic guarantees of a regulated lab and licensed pharmacists, the skill-level and experience in compounding of the pharmacist in question is vital to ensuring Taylor is executed in a way which comports with the *Eighth Amendment*."). Likewise, because learning the source of the bulk materials used by the compounding pharmacy could lead to information supporting Hill's cruel and unusual punishment claim, I would also order that information disclosed to Hill. Id. at *5-6 (Bye, J., dissenting) ("Pain to Taylor may not be the fault of the compounding pharmacist, but could also be laid at the feet of suppliers who have failed to provide proper ingredients. Missouri has yet to provide information on the source of any drugs to be used to execute Taylor, leaving open the possibilities the ingredients do not meet legal or medical standards.").

In sum, because I believe that the confidential inmate state secret statute denies Hill due process by preventing him from having a legitimate opportunity to prove his cruel and unusual punishment claim, I respectfully dissent to the majority's decision to reverse the Superior Court's granting of an interlocutory injunction pending the State's disclosure of the information indicated.

I am authorized to state that Justice Hunstein joins in this dissent.