## S12A1819. HILL v. OWENS et al.
### (738 SE2d 56)

HINES, Justice.

This case concerns the management of prisons and inmates in Georgia, and its effects potentially sweep broadly across that subject. Specifically, this case concerns who is legally authorized to select the drug or drugs to be used in executions in Georgia and how that choice may be made. However, this case could also affect the remaining myriad of management decisions made throughout Georgia's prison system, and this case concerns when those decisions must be made directly by the Board of Corrections in its policy-making role versus when they may be left to the statutorily-granted management prerogatives of the Commissioner of Corrections and the Department of Corrections that he manages.

Warren Lee Hill was convicted of murdering a fellow inmate in the Lee County Correctional Institute by beating the victim with a board embedded with nails. The jury fixed Hill's sentence at death, and this Court affirmed. See *Hill v. State,* 263 Ga. 37 (427 SE2d 770) (1993). Hill was unsuccessful in his initial state habeas proceedings and in his federal habeas proceedings. See *Turpin v. Hill,* 269 Ga. 302 (498 SE2d 52) (1998) (state habeas appeal); *Head v. Hill,* 277 Ga. 255 (587 SE2d 613) (2003) (state habeas appeal); *Hill v. Schofield,* 608 F3d 1272 (11th Cir. 2010) (federal habeas appeal in which a three-judge panel vacated Hill's death sentence); *Hill v. Schofield,* 625 F3d 1313 (11th Cir. 2010) (vacating the decision of the three-judge panel and ordering a rehearing en banc); *Hill v. Humphrey,* 662 F3d 1335 (11th Cir. 2011) (denying federal habeas relief on rehearing en banc), cert. denied, ___ U. S. ___ (132 SC 2727, 183 LE2d 80) (June 4, 2012). Upon the completion of Hill's federal habeas appeals, the trial court filed a new execution order, setting the seven-day window for Hill's execution for July 18-25, 2012. See OCGA § 17-10-40 (a) and (b) (providing for new execution orders setting a seven-day window for execution). The execution was originally scheduled for July 18, 2012, but it was rescheduled for July 23, 2012. See OCGA § 17-10-40 (c) (directing the Department of Corrections to set a specific execution day and time). The change in the specific execution date was announced by the Department of Corrections at approximately the same time

that the Department of Corrections announced that it was changing from a three-drug execution procedure to a one-drug procedure. As this was occurring, this Court denied Hill's application for a certificate of probable cause to appeal in his second state habeas proceedings. See *Hill v. Humphrey*, S12W1799 (July 23, 2012) (unpublished order).

In response to the announcement of the new execution procedure, Hill filed a complaint against the Board of Corrections ("Board"), the Department of Corrections ("Department"), and the Commissioner of Corrections ("Commissioner") in the Superior Court of Fulton County. In his complaint, Hill alleged that the defendants failed to comply with the requirements of the Administrative Procedure Act ("APA") in adopting Georgia's new execution procedure, and he sought a declaratory judgment, an injunction, a stay of execution, and a writ of mandamus.[1] The Superior Court granted the defendants' motion to dismiss Hill's complaint on the ground that the APA did not apply to the new execution procedure, and this Court granted Hill's application for discretionary appeal and his motion for a stay of his scheduled execution. For the reasons that follow, we affirm that dismissal.

1. The APA sets forth special requirements for the adoption of certain kinds of legally-binding rules by various agencies within Georgia government.[2] Among these special requirements for rule-making are giving 30-days' notice to interested persons, allowing for input by interested persons, giving notice to the General Assembly, and filing the final rule with the Secretary of State. See OCGA §§ 50-13-4, 50-13-6. Failure of an "agency" to comply with these requirements renders a rule invalid. See OCGA §§ 50-13-4 (d), 50-13-6 (a).

The APA specifically states that the "Board of Corrections and its penal institutions" are *not* "agencies" within the meaning of the Act. See OCGA § 50-13-2 (1). Thus, unless provided for elsewhere in the Code, the APA's requirements would not apply to the defendants here. However, OCGA § 42-2-11 provides that the Board should

---

[1] Because we affirm the dismissal of Hill's complaint against all of the defendants on other grounds, we need not address the defendants' contention that, with regard to his claim for mandamus, Hill improperly named as a defendant the "Board of Corrections" rather than its individual members. But see *McCallum v. Bryan*, 213 Ga. 669, 670 (3) (100 SE2d 916) (1957).

[2] OCGA § 50-13-2 (6) provides as follows:

"Rule" means each agency regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy or describes the organization, procedure, or practice requirements of any agency. The term includes the amendment or repeal of a prior rule but does not include the following:

(A) Statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public. . . .

establish certain "rules" and also certain "rules and regulations," and it also provides that all "rules and regulations" made by the Board will be subject to the requirements of the APA. See OCGA § 42-2-11 generally and OCGA § 42-2-11 (g) (providing for the applicability of the APA). Whether the Board's rulemaking activities should be subject to the APA is governed by OCGA § 42-2-11, because that statute is more specific than and was enacted later than the general exemption from the APA of the Board and the prison system provided for in OCGA § 50-13-2 (1). See *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.*, 266 Ga. 393, 399-400 (3) (467 SE2d 875) (1996) (noting that a more-specific statute should be treated as an exception to a more-general statute); *Jenkins v. State*, 265 Ga. 539, 540 (1) (458 SE2d 477) (1995) ("The rule for construing statutes which may be in conflict is that the most recent legislative expression prevails."). See also Ga. L. 1969, p. 598, § 1 (making rules and regulations adopted by the Board of Corrections subject to the APA); Ga. L. 1964, p. 338, § 2 (creating the APA and exempting the Board of Corrections at that time from the APA's special requirements for rule making).

2. We first address Hill's claims relative to the Board of Corrections. For the reasons explained below, we conclude that the Board is not specifically required by statute to make rules governing the particular subject of lethal injection procedures and that the Board also has not abused its discretion in declining to exercise its general statutory authority to make rules governing any aspect of the prison system in declining to make such rules.

(a) Title 42 of the Code provides as follows:

> The board shall adopt rules governing the assignment, housing, working, feeding, clothing, *treatment*, discipline, rehabilitation, training, and hospitalization of all inmates coming under its custody.

OCGA § 42-2-11 (c) (1) (emphasis supplied). Hill argues that, under this statutory duty to adopt a body of rules governing the "treatment" administered to inmates within Georgia's prison system, the Board is legally *required* to adopt rules governing executions, including the selection of the specific drug or drugs to be used at any particular execution. See 1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.9, p. 502 (5th ed. 2010). We disagree for several reasons.

We reject Hill's argument regarding the meaning of the "treatment" of inmates in the context of this subsection of the Code. OCGA § 42-2-11 (c) (1). "Treatment" in the context of governing the prison system could have two meanings. The first is an extremely

broad meaning encompassing all aspects of how inmates are "behave[d] . . . toward" or "handle[d]" by prison staff, including an infinitely-wide range of detailed topics such as the respectful language to be used with inmates, the manner in which inmates are clothed, fed, and housed, and the manner in which inmates condemned to death are executed. *The American Heritage Dictionary of the English Language,* p. 1906 (3d ed. 1992). The second is a more-focused meaning, referring to various forms of "medical aid." Id. We conclude that this more-focused meaning is the appropriate meaning within this portion of the Code for two reasons.

First, "treatment" here should be understood in relation to the other words in this subsection of the Code. "Words, like people, are judged by the company they keep." *Anderson v. Southeastern Fidelity Ins. Co.,* 251 Ga. 556, 556 (307 SE2d 499) (1983) (defining the rule of statutory construction known as "noscitur a sociis"). Also, this Court avoids interpreting statutes in a manner that renders any portion of them surplusage or meaningless. See, e.g., *Walker v. State,* 290 Ga. 696, 698 (2) (723 SE2d 894) (2012). "Treatment" is one of a number of enumerated topics concerning which the Board must adopt a set of legally-binding rules, and those topics also include "assignment, housing, working, feeding, clothing, . . . discipline, rehabilitation, training, and hospitalization." Reading "treatment" as referring to every aspect of the broad topic of how inmates are behaved toward or handled would subsume the remaining enumerated topics, rendering them surplusage and essentially meaningless. Thus, the narrower meaning regarding various forms of the medical care of inmates is to be preferred.

Second, recent legislation enacted by the General Assembly reinforces our judgment that "treatment" in this context refers to various forms of medical care rather than the general topic of how inmates are behaved toward or handled. This legislation amended the specific subsection of the Code at issue here. The new language in the subsection does not assume that "treatment" broadly encompasses how inmates are behaved toward or handled such that "treatment" would subsume issues such as the "management" of inmates; instead, the new language imposes certain new rulemaking duties on the Board related to the "management *and* treatment of inmates." OCGA § 42-2-11 (c) (2) (B) (as amended by Ga. L. 2012, p. 899, § 7-4) (emphasis supplied). Even more importantly, the new language provides that the Board's newly-required rules should address "performance *outcomes* relevant to the *level and type of treatment*" given to inmates. Id. (emphasis supplied). Using "outcome" and "level and type" in discussing "treatment" is inconsistent with a broad meaning of "treatment" that refers to all aspects of how inmates are behaved

toward or handled and suggests, instead, a narrower meaning referring to medical care, including mental health care. Furthermore, we find it noteworthy that this recent legislative action was taken after an apparent 66-year unbroken history of there being no legally-binding administrative rule regarding the execution procedures governing any method of execution since the General Assembly's designation of the topic of "treatment" and despite a number of unsuccessful claims by inmates regarding lethal injection procedures in recent years. Ga. L. 1946, p. 46, § 6. Thus, whatever meaning "treatment" potentially could bear previously within the meaning of this subsection of the Code, the General Assembly has recently indicated its intent that the word should refer only to medical care.

Finally, having concluded that "treatment" in this Code section refers only to medical care, we must address whether lethal injection constitutes medical care. Lethal injection may involve a drug or drugs that could be used in medical care; however, using a massive dose of a drug with the sole intention of causing immediate death cannot, we think, be reasonably described as medical care. Furthermore, the Code specifically provides that lethal injection does not constitute the practice of medicine. See OCGA § 17-10-38 (c).

In light of the foregoing, we conclude that the Board did not have a duty under the mandatory rulemaking provision of OCGA § 42-2-11 (c) (1) regarding the "treatment" of inmates to make rules governing lethal injection.

(b) Having concluded that the Board is not specifically required to adopt rules governing lethal injection procedures under the category of the "treatment" of inmates in OCGA § 42-2-11 (c) (1), we now turn to the question of whether such rules are legally required under the Board's more general rulemaking authority. OCGA § 42-2-11 (a) provides as follows:

> The board shall establish the general policy to be followed by the department and shall have the duties, powers, authority, and jurisdiction provided for in this title or as otherwise provided by law.

OCGA § 42-2-11 (b) further provides as follows:

> The board is authorized to adopt, establish, and promulgate rules and regulations governing the transaction of the business of the penal system of the state by the department and the commissioner and the administration of the affairs of the penal system in the different penal institutions

coming under its authority and supervision and shall make the institutions as self-supporting as possible.

Under these general grants of authority, the Board would have the *authority* to make rules governing lethal injection procedures. However, because the Board has made no such rule, the question we must address is whether it had a legal *duty* to do so under these general provisions.

It would be impossible for the Board to adopt rules governing *every* aspect of prison life, and it would be unnecessary and even undesirable for it to adopt such rules regarding certain specific topics. In weighing the adequacy of a given agency's rulemaking, Georgia courts will defer to the agency's "presumed expertise" and consider whether the agency's rulemaking decision was reasonable. See *Georgia Oilmen's Assn. v. Georgia Dept. of Revenue*, 261 Ga. App. 393, 398 (1) (b) (ii) (582 SE2d 549) (2003) ("Because of agencies' presumed expertise in dealing with complex issues, we defer to [a given agency] on the issue of reasonableness unless there is evidence the regulation is arbitrary and capricious."). Furthermore, the Code specifically provides as follows regarding the rulemaking of the Board: "All rules and regulations enacted by the board under the authority of this chapter must be *reasonable*." OCGA § 42-2-12 (emphasis supplied). We understand this reasonableness requirement regarding such rules to include decisions regarding what rules *not* to adopt, particularly where, as here, the grant of authority to adopt such rules is a general delegation on unlimited subject matters. See Alfred C. Aman, Jr., & William T. Mayton, *Administrative Law*, § 13.11.3, p. 521 (1993) (noting the deference afforded by courts where agencies have chosen not to engage in rulemaking).[3]

The Code provides that the Board is responsible for establishing general policy for the prison system but that the Commissioner is entrusted with the power to direct the prison system's functions within that general policy. The Code provides as follows:

. . . The commissioner shall be the chief administrative officer of the department. Subject to the *general policy*

---

[3] See, e.g., *American Horse Protection Assn. v. Lyng*, 812 F2d 1, 4-5 (D.C. Cir. 1987), stating as follows:

[A]n agency's refusal to institute rulemaking proceedings is at the high end of the range [of the deference afforded to an agency]. . . . Such a refusal is to be overturned "only in the rarest and most compelling of circumstances," . . . which have primarily involved "plain errors of law, suggesting that the agency has been blind to the source of its delegated power."

(citations omitted).

established by the board, *the commissioner shall* supervise, *direct*, account for, organize, plan, administer, and execute the functions vested in the department by this title.

OCGA § 42-2-6 (a) (emphasis supplied). See also OCGA § 42-2-11 (a) ("The board shall establish the general policy to be followed by the department. . . ."). Unlike other agencies within Georgia government that govern only certain aspects of the lives of *free* persons, the Board is responsible for making policy to guide and govern a prison system that by its very nature must daily direct nearly every aspect of the lives of those persons who have been placed under the control of the prison system by virtue of their convictions and sentences. Most agencies may adopt legally-binding "rules" governing private citizens' activities only where specifically authorized by statute and only when the decision about that activity is made by the official or body empowered by statute to adopt such "rules." In contrast, the General Assembly has envisioned a *prison system* where prisoners are assumed to *already* rest almost entirely under the control of the prison system by virtue of their convictions and sentences before a single policy is adopted by the Board, where the Board adopts general policy to guide and govern the management of the prison system, and where the Commissioner as the chief administrative officer directs the functioning of the entire prison system by exercising his discretion within the bounds of relevant law and the Board's policy.

This distinction between typical agencies in Georgia government and the prison system explains the awkwardness in applying one of the statutory exemptions to the APA's requirements. For an agency covered by the APA, the APA's special requirements do not apply to "[s]tatements concerning only the internal management of [the] agency and *not affecting private rights* or procedures available to the public." OCGA § 50-13-2 (6) (A) (emphasis supplied). Hill argues that this exception does not apply to the selection of execution drugs, which could affect his "private rights" under the Constitution. However, this Court need not be concerned with whether this exception, or any other, would apply if the *Board* adopted a rule concerning the details of executions, because it has not done so. Instead, that decision has been made by the Commissioner in his role as the chief administrative official of the prison system, a management decision that was within his statutory authority to make and was indeed part of his statutory *duty* to make. Hosts of management decisions that are necessarily and continuously made by the Commissioner and the Department in the course of running the prison system could affect the "private rights" of inmates, because inmates are not free like ordinary citizens to make those decisions for themselves and because

those decisions, if made for them in some outrageous fashion, could potentially infringe on inmates' constitutional rights. This is true in examples from the obvious to the absurd.

However, the Code has not created a structure under which each of those decisions must be made by the Board under its power to adopt rules to govern the Commissioner and the Department. Instead, the Code has created a system where such rules are adopted when the Board deems them necessary and wise within its discretion and where Georgia courts interfere only where the Board has exercised that discretion in a manner that is unreasonable.

The Code imposes on the Commissioner and the Department a variety of duties specific to managing executions, among which choosing the drug or drugs is just one. See OCGA §§ 17-10-40 (c) ("The Department of Corrections shall set the day and time for execution within the time period designated by the judge of the superior court."); 17-10-41 (requiring the Commissioner to select appropriate staff for executions and to determine the number of witnesses); 17-10-44 ("The Department of Corrections shall provide a place for execution of the death sentence and all necessary apparatus, machinery, and appliances for inflicting the penalty of death."). It is clearly reasonable for the Board not to attempt to circumscribe the Commissioner's management prerogatives regarding each of these individual duties, which may require the exercise of discretion under fast-changing circumstances.

Furthermore, the particular issue of lethal injection procedures is heavily litigated and closely scrutinized by state and federal courts throughout the nation, including this Court. Due to litigation challenging existing methods of execution and due to other factors, both judicial and non-judicial, that have affected the availability of certain drugs, the Commissioner has recently found it necessary or wise to make repeated changes to the lethal injection procedures employed by the Department. We conclude that it was not unreasonable for the Board to entrust the *specific* topics involved in the management of executions to the Commissioner under the statutory and constitutional mandates that already apply to him rather than to give him detailed and rigid directives through rules. See *Diaz v. State of Florida*, 945 S2d 1136, 1143 (Fla. 2006) ("In light of the exigencies inherent in the execution process, judicial review and oversight of the D[epartment of Corrections'] procedures is preferable to [APA] administrative proceedings."), overruled on other grounds by *Darling v. State*, 45 S3d 444, 453 (Fla. 2010). See also *Brown v. Vail*, 237 P3d 263, 270 (Wash. 2010) ("The [execution] protocol itself is not an order or directive subjecting a person to a penalty or sanction, but rather a procedure for carrying out an already imposed penalty."); *Abu-Ali*

*Abdur'Rahman v. Bredesen*, 181 SW3d 292, 312 (Tenn. 2005) (holding that the management of executions is ill suited to APA rulemaking).[4]

Rather than adopting a detailed rule governing lethal injections, the Board could have adopted a highly-generalized rule regarding Georgia's lethal injection procedure that simply echoed the statutory and constitutional duties under which the Commissioner already operates, such as one requiring the Department to adopt a method that is "effective and humane"; however, such a general rule would have added nothing to the statutory and constitutional standards that already apply to the Commissioner and the Department that he manages and therefore would be essentially meaningless. Furthermore, Hill's complaint did not seek such a general rule but, instead, sought to have the Board ordered to choose the specific drug or drugs to be used in his execution.

In light of the foregoing, we conclude that it was not unreasonable for the Board to not find it necessary to adopt a rule governing the detailed procedures to be followed in executions, including the selection of the drug or drugs to be used.

3. Hill's complaint also named the Commissioner and the Department as defendants. As explained above, the Code grants solely to the Board the authority to create rules to govern the prison system. See OCGA § 42-2-11. Compare OCGA § 2-2-7 (4) (granting to the Commissioner of Agriculture the power to adopt legally-binding rules). The Commissioner and the Department that he manages have not been granted the statutory authority to create *any* legally-binding "rules" within the meaning of Title 42 of the Code. If he ever purported to create such legally-binding rules, they would be invalid and unenforceable. However, the nature of his duties as the chief administrative official of the prison system obviously requires him to issue directives to the staff and inmates under his supervision, whether formally or informally and whether directly or through his delegation of authority. None of his directives given in managing the prison system, whether committed to writing or not, are subject to the APA's requirements, because they are not legally-binding rules. To say that his management directives are not legally binding does not mean that they may be blithely disregarded, however, because they are within his authority as the chief administrative official to give within the

---

[4] We are aware that other courts have ruled that their states' versions of the APA must apply to the selection of lethal injection procedures. See *Bowling v. Kentucky Dept. of Corrections*, 301 SW3d 478 (Ky. 2010); *Evans v. State*, 914 A2d 25 (Md. 2006). However, we find those decisions applying foreign state law to be unpersuasive here as we apply Georgia law to the question of whether the Board has reasonably applied its general authorization to make rules governing the prison system under OCGA § 42-2-11 (b).

bounds set by the policy issued by the Board, by statutory law, and by constitutional law. The Commissioner has not unreasonably chosen to carry out his statutorily-imposed management duties regarding executions through the issuance of a written document. The Commissioner's management authority is not diminished simply because he has exercised his management authority through a formal document rather than exercising it less formally, such as by simply placing a telephone call to the officials involved or even delegating his authority to the warden of Hill's prison. Accordingly, we conclude that the document at issue in this case setting forth the specific actions to be taken in current executions is a management directive and not an improper and invalid attempt to engage in legally-binding rule-making in an attempted usurpation of the Board's powers.

However, the Board has adopted the following rule to which the Commissioner is legally bound: "The Commissioner of the Department of Corrections shall formulate and submit to the Board of Corrections those reasonable rules and regulations or changes thereto which are required to govern the Corrections system." Ga. Comp. R. & Regs. r. 125-1-1-.07 (1). See *Brown v. Caldwell*, 231 Ga. 795, 796 (204 SE2d 137) (1974) (noting that an inmate may have a judicial remedy in cases where the rules of the Board have not been followed). This rule plainly provides for the Commissioner, in deciding which rules to propose to the Board, to exercise his discretion in deciding what "reasonable rules" are "required" versus what possible rules seem to him to be unnecessary. Ga. Comp. R. & Regs. r. 125-1-1-.07 (1). And this discretion is always bounded by the Board's authority to adopt sua sponte any rules that it might deem necessary within its own, independent discretion. For the same reasons set forth above regarding the Board, the Commissioner could reasonably conclude that the management of the details of executions, including specifically the choice of the drug or drugs that are appropriate at any given time in light of the judicially-scrutinized and fast-changing issues involved, was suited to ongoing management decisions by the Commissioner in furtherance of his statutorily-imposed duty to manage all aspects of executions and that a rule from the Board to govern execution procedures was unnecessary. Thus, the Commissioner had no legal duty under the Board's existing rules to propose a rule to the Board regarding the management of executions.

In light of the foregoing, we conclude that Hill's claims against the Commissioner and the Department, like those against the Board, were properly dismissed by the Superior Court.

4. Because the Superior Court did not err by dismissing Hill's complaint against the defendants, it also did not err by denying Hill's motion for a stay of execution.

5. The stay of execution previously issued by this Court to allow for this appeal is dissolved.

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 4, 2013.

*Robins, Kaplan, Miller & Ciresi, V. Robert Denham, Jr., Meredith L. Whigham, Brian Kammer,* for appellant.

*Samuel S. Olens, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Joseph J. Drolet, Senior Assistant Attorney General, Ashley L. Culberson, Assistant Attorney General,* for appellee.