# SUPREME COURT OF GEORGIA

Case No. S23A0073

September 30, 2022

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

SCOTT K. CAMP v. RYAN CHRISTOPHER WILLIAMS et al.

Upon consideration, it appearing that the attached opinion decides an election issue, which must be handled in an expedited manner, any motion for reconsideration must be received in the Supreme Court E-Filing/Docket (SCED) System by 12:00 p.m. on Friday, October 7, 2022.

**SUPREME COURT OF THE STATE OF GEORGIA**

Clerk's Office, Atlanta
I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

, Clerk

NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 30, 2022

S23A0073.  CAMP v. WILLIAMS et al.

PETERSON, Presiding Justice.

This case is a dispute over who can run for Chief Magistrate Judge of Douglas County in the November 2022 election. After the incumbent successfully challenged the qualifications of the only person who qualified to run for the Democratic nomination, the Douglas County Democratic Party Executive Committee purported to name a replacement. That led to another challenge, this one by the incumbent's husband (a registered voter eligible to vote in the election), contending that the substitution was improper. The superior court agreed that the Douglas County Board of Elections and Registration (the "Board") was not legally authorized to allow the substitution, but ruled that the statutory vehicle through which the challenge was asserted — OCGA § 21-2-6 — covers only

2

challenges to a candidate's qualifications to hold office (like age, residence, and bar membership), not whether the candidate fulfilled the necessary prerequisites to seek office (like a proper substitution).

We granted an application for discretionary appeal, expedited consideration in the light of the rapidly approaching election, and now reverse. Code section 21-2-6 allows the challenge here because "qualifications," as that term is used in the statute, includes all of the prerequisites for seeking and holding office. The substitute candidate did not properly qualify to seek office, so the Board lacked authority to put him on the ballot. And because electors have an interest in having the community's government offices filled by duly qualified officials, the Board's decision allowing an unqualified candidate on the ballot violated a substantial right of an elector. Accordingly, the decision below must be reversed.

1. This controversy began when the incumbent Chief

Magistrate Judge (and Republican nominee),[1] Susan Camp, successfully challenged in superior court the qualifications of her would-be-opponent, Sylvia Baker, on the grounds that Baker is not a member of the State Bar of Georgia. Baker was the only Democratic candidate who qualified to run for Chief Magistrate, so her removal from the Democratic Primary ballot meant that Camp would run without a Democratic challenger in the general election.

In response, the Douglas County Democratic Party purported to substitute a new candidate before the primary election — Ryan Christopher Williams — who had qualified to run for superior court judge. Scott Camp, Susan Camp's husband and a registered voter eligible to vote in the election for Chief Magistrate, challenged that action in a written submission to the Board.

After a hearing, the Board dismissed the challenge, despite the fact that Williams was not on the list of certified Democratic candidates for the chief magistrate seat. See OCGA § 21-2-154 (b).

_____

[1] Unlike many other judicial offices across Georgia, this Douglas County office is a partisan office.

4

The Board announced that Williams would appear on the general election ballot as the Democratic nominee for Chief Magistrate Judge. Camp sought judicial review under OCGA § 21-2-6, naming Williams, the Board, the Board's members, and its director, Milton Kidd, as respondents.

The superior court agreed that the Board should not have replaced Baker with Williams, but refused to reverse the Board's decision. The challenge allowed by OCGA § 21-2-6, the court said, "does not encompass the process by which [a candidate is] placed on the ballot — it is limited to challenges upon his *qualifications* to hold the office." The court reasoned that subsection (a) of the statute refers to "the constitutional and statutory qualifications for holding the office being sought," which the court took to mean personal characteristics like residence, age, citizenship, voter registration, and education. See OCGA § 21-2-6 (a); see also OCGA § 15-10-22 (identifying the "Qualifications of magistrates"). The court therefore believed that reversing the Board's decision to allow Williams's substitution "would require it to add language to the statute that is

5

simply not there."

Following that decision, Camp sought and obtained discretionary review from this Court. We directed the parties to address one question: "[d]id the Superior Court err in concluding that OCGA § 21-2-6 did not authorize the court to reverse the decision of the Superintendent and the Douglas County Board of Elections?"

2. The answer to that question is yes. Code section 21-2-6 does authorize voters to challenge a candidate who has not satisfied the procedural prerequisites to appearing on the ballot. As explained below, the word "qualifications" is not as a semantic matter limited to the prerequisites for holding office. Moreover, the permission to challenge a candidate's qualifications to "seek" office indicates that prerequisites to appearing on the ballot are included in the challengeable qualifications. And this understanding is confirmed by subsection (d) of the statute, which provides that failure to satisfy one particular procedural prerequisite — payment with a valid check — requires an automatic finding of failure to meet the

6

"qualifications" (albeit for "holding" the office) even without any challenge.

Code section 21-2-6 provides that "[e]very candidate for county office who is certified by the county executive committee of a political party or who files a notice of candidacy . . . shall meet the constitutional and statutory qualifications for holding the office being sought." OCGA § 21-2-6 (a). "[A]ny elector who is eligible to vote for any such candidate may challenge the qualifications of the candidate . . . giving the reasons why the elector believes the candidate is not qualified to seek and hold the public office for which the candidate is offering." OCGA § 21-2-6 (b). And if that happens, "[t]he superintendent shall determine if the candidate is qualified to seek and hold the public office for which the candidate is offering." OCGA § 21-2-6 (c).

"When we consider the meaning of a statute, 'we must presume that the General Assembly meant what it said and said what it meant.'" *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (quoting *Arby's Restaurant Group, Inc. v. McRae*, 292 Ga. 243,

7

245 (1) (734 SE2d 55) (2012)). "To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." Id. at 172-173 (1) (a) (citations and punctuation omitted).

(a) Starting with the text, the ordinary meaning gleaned from a review of dictionary definitions of "qualification" offers little support for Williams's and the Board's argument that the word as used in the statute can refer only to the attributes required to hold office. And although examination of dictionary definitions of a single word is not a substitute for a broader consideration of context and history, see, e.g., *Jones v. State*, 304 Ga. 594, 602 (3) (820 SE2d 696) (2018) (declining to apply dictionary definitions when an argument based on them "views one word in isolation and ignores the context"), "reviewing dictionaries from the era of the statute's enactment may assist in determining its meaning." *State v. Henry*, 312 Ga. 632, 637 (3) (a) (864 SE2d 415) (2021) (citing *Sandifer v.*

*U.S. Steel Corp.*, 571 U.S. 220, 227-228 (134 SCt 870, 187 LE2d 729) (2014)).

So understood, contemporary dictionaries do not indicate a limited scope to the meaning of "qualifications." Instead, contemporary dictionaries show that the ordinary meanings of "qualifications" and "qualified" both encompass necessary pre-requisites generally — not merely traits or attributes.

Around the time the statute was enacted, see Ga. Laws 1980 p. 312, 313-314, § 2, "qualification" was commonly defined to mean things like "the act of qualifying or the state of being qualified"; "any quality, knowledge, ability, experience, or acquirement that fits a person for a position, office, profession, etc." or "a condition that must be met in order to exercise certain rights." Webster's Deluxe Unabridged Dictionary, 1473 (2d ed. 1983); see also Webster's Ninth New Collegiate Dictionary, 963 (1985); Webster's Third New International Dictionary, 1858 (1976).

Along the same lines, "qualified" was commonly defined to mean things like "having met conditions or requirements set"; and

9

"having the necessary or desirable qualifications." Webster's Deluxe Unabridged Dictionary, supra at 1473; see also Webster's Ninth New Collegiate Dictionary, supra at 963; Webster's Third New International Dictionary, supra at 1858.

As a matter of ordinary meaning, therefore, there is no reason to believe that the General Assembly's use of the words "qualifications" or "qualified" compels the conclusion that OCGA § 21-2-6 allows challenges only to attributes like age, residency, and bar status.

(b) Moreover, "[a]s we have said many times before when interpreting legal text, 'we do not read words in isolation, but rather in context.'" *City of Guyton v. Barrow*, 305 Ga. 799, 805 (3) (828 SE2d 366) (2019) (quoting *Smith v. Ellis*, 291 Ga. 566, 573 (3) (a) (731 SE2d 731) (2012)). Indeed, "[t]he primary determinant of a text's meaning is its context[.]" *City of Guyton*, 305 Ga. at 805 (3). So "'[e]ven if words are apparently plain in meaning, they must not be read in isolation and instead, must be read in the context of the regulation as a whole.'" Id. (quoting *Elliott v. State*, 305 Ga. 179, 187

10

(II) (B) (824 SE2d 265) (2019)). To discern that context, "we may look to the provisions of the same statute, the structure and history of the whole statute, and other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." *Langley v. State*, 313 Ga. 141, 143 (2) (868 SE2d 759) (2022) (quoting *Zaldivar v. Prickett*, 297 Ga. 589, 591 (1) (774 SE2d 688) (2015)). Indeed, "all statutes relating to the same subject matter are to be construed together, and harmonized wherever possible." *Langley*, 313 Ga. at 143 (2) (quoting *Hartley v. Agnes Scott College*, 295 Ga. 458, 462 (2) (b) (759 SE2d 857) (2014)).

(i) Beginning with immediate context, two features of OCGA § 21-2-6 show that "qualifications" are best understood to include (and "qualified" is best understood to mean that a person has satisfied) the pre-requisites for seeking and holding office—including any necessary procedural steps.

First, subsections (b) and (c) contemplate a challenge to the candidate's qualifications to "seek and hold" office. If the word "seek" is not superfluous, then it suggests that an elector may show that

11

the candidate is not "qualified" to run for office — not merely that he would not be qualified to serve, if elected. See *Hill v. Owens*, 292 Ga. 380, 383 (2) (a) (738 SE2d 56) (2013) ("this Court avoids interpreting statutes in a manner that renders any portion of them surplusage or meaningless").

Take OCGA § 15-10-22: that section defines the "[q]ualifications of magistrates" upon "taking office." Those are requirements for "hold[ing]" the office. See OCGA § 21-2-6 (b)-(c). So if that was all OCGA § 21-2-6 was concerned with, then there would be no need to specify that voters may challenge whether the candidate is eligible to "seek" the office. Compare "Seek," Webster's Ninth New Collegiate Dictionary, supra, at 1063 ("to ask for"; "to try to acquire or gain"; "to make an attempt"); Webster's Deluxe Unabridged Dictionary, supra at 1643 ("to make pursuit; to attempt to find or take") with "Hold," Webster's Deluxe Unabridged Dictionary, supra at 866 ("to have and keep as one's own; to be in possession of; own; occupy; as, he *holds* the office of mayor") (emphasis in original). And the only apparent meaning of "seek[ing]

12

office" is running for office, at least in the context of a statute about elections. See OCGA § 21-2-130 *et seq.* (detailing the ways in which a candidate may "qualify" for an election). Thus, if the use of "seek" in this statute does not mean that a voter can challenge whether a candidate is duly qualified to *run* for office, it means nothing at all, given that the statute uses the word "hold" separately.

Williams and the Board disagree. They point out that subsection (b) points back to the qualifications of any candidate "referred to in subsection (a)" — and they conclude that this means "qualifications" refers only to the requirements for holding the office. OCGA 21-2-6 (b).

But even that misreads the statute. Subsection (b) does not simply refer to the "qualifications" mentioned in subsection (a), it makes clear that one may challenge "the qualifications of any *candidate* referred to in subsection (a)." OCGA § 21-2-6 (b) (emphasis supplied). Thus, the cross reference limits which candidates can be challenged under section 21-2-6; it does not limit or modify the operative language of subsections (b) and (c).

13

Second, subsection (d) uses the word "qualifications" to refer to a procedural pre-requisite: if a candidate pays his qualifying fee with a check that is returned for insufficient funds, "the superintendent shall automatically find that such candidate has not met the qualifications for holding the office being sought[.]" OCGA § 21-2-6 (d). Williams and the Board suggest that this is merely an exception that proves their rule (i.e., that qualifications are purely substantive), but subsection (d) gives no sense that it is providing an exception or even that it is using "qualifications" in an unusual sense. Instead, it seems plain enough that paying one's qualifying fee with a bad check is singled out because the superintendent must "*automatically* find that such candidate has not met the qualifications" — i.e., no challenge under (b) or (c) is necessary, and the superintendent has no discretion to overlook the failure. See id. (emphasis added).

Thus, like the ordinary meaning of the words themselves, the context of OCGA § 21-2-6 confirms that a candidate meets the "qualifications" to seek and hold office only if he has satisfied *all* of

14

the pre-requisites, including procedural requirements.

(ii) Turning to broader statutory context, this understanding also comports with the use of related terminology and related provisions in the Elections Code.

For candidates, "[q]ualifications" are the pre-requisites (whether things like residency and bar membership or procedural steps and processes) to seek and hold office. See OCGA § 21-2-130 (dealing with the methods of "Qualification of candidates": "Candidates may qualify for an election" by nomination, a notice of candidacy, special rules for presidential electors, or substitute nomination under OCGA § 21-2-134); OCGA § 15-10-22 (setting the qualifications of magistrates, including residence, age, citizenship, voter registration, high school diploma, and other qualifications imposed by local law); OCGA § 15-7-21 (setting the qualifications of state court judges, including residence, age, length of time admitted to practice law, and good standing within the State Bar); OCGA § 15-18-3 (setting the qualifications of district attorneys, including residence, age, and bar status); see also Ga. Const. of 1983, Art. VI

Sec. VII, Par. II (imposing as qualifications for various judicial office requirements such as length of time admitted to practice law and residency in the relevant location, and empowering the General Assembly to impose additional requirements by law); OCGA § 21-2-216 (a) (an "Elector's qualifications" include being "[r]egistered as an elector in the manner prescribed by law").

"Qualifying," in turn, is the process by which a person demonstrates to election officials that he or she possesses or satisfies the necessary prerequisites. See, e.g., OCGA § 21-2-130 et seq.[2]; see also OCGA §§ 21-2-153 et seq., 21-2-172, 21-2-181 et seq., 21-2-214.

And completing qualifying makes a person "eligible" to seek

---

[2] Several provisions use "qualified" as the past tense of "qualifying," OCGA §§ 21-2-131 (c) (1); 21-2-132 (e) (5); 21-2-134 (e); 21-2-137; 21-2-138; 21-2-153 (c) (1) (D), (d) (1); 21-2-153.1 (c), (e); 21-2-154 (a), (b); 21-2-155; 21-2-171 (a). Many others refer to the qualifying process with words like

- "qualify," OCGA §§ 21-2-9 (d); 21-2-130; 21-2-132 (d) (5), (j) (1); 21-2-132.1 (b); 21-2-134 (b) (1) (B), (b) (1) (C), (b) (1) (D); 21-2-137; 21-2-153 (a) (1) (B), (b), (c), (f), (g) (1); 21-2-153.1 (a), (c);  21-2-157 (b); 21-2-214 (b); 21-2-217 (a); or
- "qualifies," OCGA §§ 21-2-131 (b) (1), (c) (3)-(5); 21-2-135 (a) (1); 21-2-153 (d) (1); 21-2-154 (a); and even
- "qualification(s)." OCGA §§ 21-2-131 (c) (1)-(2); 21-2-153, 21-2-153.1; 21-2-182.

16

office. See OCGA § 21-2-132 (b)-(d); see also OCGA § 21-2-133 (a) ("No person elected on a write-in vote shall be eligible to hold office unless notice of his or her intention of candidacy was filed and published" at the prescribed time before the election).[3] Of course, an otherwise eligible candidate can lose eligibility under certain circumstances — which, depending on the situation, is sometimes described in terms of ineligibility and sometimes in terms of disqualification. See OCGA §§ 21-2-8, 21-2-133 (d); 45-2-1 (ineligibility); OCGA §§ 21-2-8, 21-2-134 (d)-(e), 21-2-153 (d) (2) (disqualification).[4]

---

[3] In other contexts, the Elections Code sometimes uses the word "eligible" to refer to the mere potential to hold office, see OCGA § 21-2-153 (b) (2), (e) (7); OCGA § 21-2-153.1 (d) (7); OCGA § 21-2-132 (f) (7).

[4] We note that this terminology is used in similar (but not always identical) ways when describing voters (whom the Code calls "electors"). Like candidates, voter qualifications encompass both substantive attributes and procedural steps. See OCGA §§ 21-2-216 (a); 21-2-227. And, as with candidates, a voter can be "disqualified." See OCGA §§ 21-2-216 (b), (d), (f); 21-2-224 (d), (e); 21-2-228 (b), (e); 21-2-229 (a); 21-2-230. But the Elections Code also uses the term "qualified" in conjunction with "registered" to establish a voter's entitlement to vote or sign a petition (which is only sometimes called eligibility), see OCGA §§ 21-2-132 (h) (1)-(2); 21-2-153 (a.1) (1)-(2); 21-2-182; 21-2-183 (b) (3); 21-2-211; 21-2-221.2, even though registration is one of the express qualifications for an elector, see OCGA § 21-2-216 (a). "Eligible," in turn, can sometimes describe entitlement to vote in its own right, see OCGA §§ 21-2-216 (g) (1); 21-2-220 *et seq.*, but it is also sometimes used in conjunction

On this score, the Board argues that many of these examples use "qualification" in isolation, rather than in the context of "holding the office being sought." OCGA § 21-2-6 (a). But again, that just focuses on the terminology of subsection (a), which *encompasses* the procedural pre-requisites referenced in subsections (b) and (c).

Williams, for his part, adds that the process or means of qualifying is neither equivalent to nor interchangeable with a candidate's qualifications. That is true, so far as it goes, but (for the reasons just discussed) it does not show that procedural hurdles are not qualifications necessary "to seek and hold" office, OCGA § 21-2-6 (b)-(c).

In short, our conclusion — that the "qualifications" referenced in OCGA § 21-2-6 includes both the legally specified prerequisites for holding office and the procedural requirements necessary to seek

---

with "registered" and/or "qualified" to narrow all registered voters to just those able to vote in a particular election. See OCGA §§ 21-2-132 (h) (1); 21-2-153 (a.1) (1); 21-2-170 (b); 21-2-211. And because of that, it is used in various places throughout the Elections Code for other things like tabulating the number of signatures needed for qualifying petitions. See OCGA §§ 21-2-132 (h) (1); 21-2-170 (b); 21-2-180. But, as with candidates, "eligible" is also sometimes used to refer to the potential of being entitled to vote at some future time upon fulfilling procedural requirements. See OCGA § 21-2-221.2 (b) (5).

office — fits comfortably with the overall usage of that and related terms throughout the Elections Code.

(c) Thus, OCGA § 21-2-6's reference to the qualifications for seeking and holding office is best read to include all pre-requisites — including the procedural requirements to seek office — not just the traits required to hold it.

That conclusion is enough to resolve this case. It is undisputed that Williams did not qualify for the election through the Democratic primary in the time prescribed by law. See OCGA § 21-2-154 (setting the time for qualifying in a partisan primary); OCGA § 21-2-130 (describing the general pathways to qualify for an election). And because Georgia law allows a political party to substitute one candidate for another only *after* the original candidate has secured the nomination, Williams could not qualify as a substitute candidate. See OCGA § 21-2-134 (a), (b) (1). The Board's only real counterargument is that nothing in the Election Code prohibited them from doing so. But this misunderstands the nature of the Board's power. The Board does not generally have power to do

19

whatever is not prohibited; rather, the Board has only that power granted to it by law. See OCGA § 21-2-40 (b); *Glustrom v. State*, 206 Ga. 734, 738 (58 SE2d 534) (1950) ("An administrative agency of government . . . can have only the administrative or policing powers expressly or by necessary implication conferred upon it[.]"). Unfettered substitution of candidates is not one of those powers.

Thus, Williams did not "qualify for [the] election" under OCGA § 21-2-130, and he is not "qualified to seek and hold the public office" of Chief Magistrate of Douglas County. See OCGA 21-2-6 (b)-(c). The superior court erred in holding otherwise.

3. Williams and the Board also urge us to affirm the judgment below under the "right for any reason" rule, arguing that Camp has not shown that his "substantial rights" were prejudiced within the meaning of the statute's remedial section. See OCGA § 21-2-6 (e). Camp responds that his substantial rights *have* been prejudiced because the Superior Court's mistaken reading of the statute made a difference in the outcome of his challenge. We agree.

Code section 21-2-6 (e) provides that "[t]he [reviewing] court

may reverse or modify the decision [of the county elections and registration board] if substantial rights of the appellant have been prejudiced because the findings, inferences, conclusions, or decisions of the superintendent are" unlawful on one of several specified bases. See also OCGA § 21-2-5 (companion statute for the qualifications of candidates for federal and state office); OCGA § 50-13-19 (h) (similar standard for judicial review of administrative agency decisions). Although our past cases on the subject have generally involved the right to seek elected office, see *Handel v. Powell*, 284 Ga. 550, 553 n.3 (670 SE2d 62) (2008); *City of Greenville v. Bray*, 284 Ga. 641, 641-642 (670 SE2d 98) (2008), the statute itself is not so limited.

Georgia law recognizes voters' "interest in having the public offices in their community held by legally qualified persons[.]" *Lilly v. Heard*, 295 Ga. 399, 404-405 (2) (c) (761 SE2d 46) (2014) (citing OCGA § 9-6-60 (a "person" interested in a public office may seek a writ of quo warranto "to inquire into the right of any person to any public office"), and *McCullers v. Williamson*, 221 Ga. 358, 360 (1)

21

(144 SE2d 911) (1965) (holding that residents and taxpayers of Walton County had a sufficient "interest" in the offices of the local board of education to give them standing to file a quo warranto action)). No one doubts that a candidate has a substantial interest in running for office, but electors have a substantial interest, too. The Elections Code requires that candidates be duly qualified to run for office, and  OCGA § 21-2-6 is an express vehicle to vindicate voters' interest in ensuring that is so. Any other conclusion would flatly contradict the General Assembly's decision to give "any elector who is eligible to vote" for a candidate the power to "challenge the qualifications of [that] candidate[.]" OCGA § 21-2-6 (b).

Williams and the Board argue that we have described interests like the one Camp attempts to vindicate here as a "public . . . as opposed to a private right." *Lilly,* 295 Ga. at 405 (2) (c). True enough. But *Lilly* said so only in the context of explaining that one such challenge had preclusive effect on a subsequent similar challenge to the same candidate. Because the interest in qualified candidates is common to the political community as a whole, voters "have an

22

identity of interests" making them "in privity" for purposes of *res judicata*. Id. at 404-405 (2) (c). That is all that *Lilly* meant by "public right."

Nothing about *Lilly*'s holding means that voters, as individuals, do not have an interest sufficient for vindication under this statute — quite the opposite. The first challenger in *Lilly* was *himself* an individual voter — and his individual assertion of the public right was both permissible (the relevant point here) and had preclusive effect on the second set of challengers (the key point in *Lilly*). Id. at 400 (1), 404-405 (2) (c). Indeed, we have held in other contexts that voting rights are individually cognizable for litigation purposes, *even if* they are shared among the general public. See *Manning v. Upshaw*, 204 Ga. 324, 326-327 (2) (49 SE2d 874) (1948) (plaintiff, as a "citizen and a voter" of Alpharetta, may maintain a petition for mandamus to compel the mayor and city council members to call for an election to elect their successors: "[i]t cannot be said that this is not a personal right, the denial of which would be an injury as an infringement of that right").

Thus, Camp, as an elector of Douglas County, has such a substantial right — and the superintendent's legally erroneous decision to allow Williams to remain on the ballot prejudiced that right. We therefore reverse the decision of the superior court, and remand for further proceedings consistent with this opinion.

*Judgment reversed and case remanded with direction. All the Justices concur.*

BETHEL, Justice, concurring.

I join the opinion of the Court in full.

I write separately to note and address a September 28, 2022, filing in this Court by the Board and Kidd, which they styled as a "Notice to Court." While acknowledging that the information contained therein is not part of the record in the case and thus does not provide a basis for the Court's decision, the Notice indicates that before placing Williams on the ballot, the Board sought guidance from the Elections Division of the Georgia Secretary of State's office, and was advised that "allowing . . . Williams's candidacy was the appropriate course of action given the novel situation and lack of clear guidance in state statutes." The Notice states that "[t]he Board therefore took its obligations seriously . . . ."

I accept the representations made by the Board and Kidd through their counsel (who are officers of the Court) and appreciate the difficulty that government agencies often have in the absence of a statute or court decision expressly on point. I also trust that the Court's opinion in this case will provide sufficient guidance in any

25

future such situation and will reinforce that, for a government entity whose authority on the relevant point is purely a creature of statute, the absence of statutory authority is the absence of legal authority to act.

I am authorized to state that Chief Justice Boggs, Presiding Justice Peterson, Justice Warren, and Justice Colvin join in this concurrence.